GALESBURG & K. ELECTRIC RY. CO. v. HART et al.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.)

No. 2137.

1. EQUITY ⬤—273—AMENDMENT OF BILL—NEW OR DIFFERENT CAUSE OF ACTION.

A bill to enforce a statutory lien for work done under a contract alleged that, by reason of the circumstances and an oral contract, a prior written agreement, to which there was another party, became the contract between the parties under which the work was done, which defendant denied. The master found on the proofs that the written contract had been adopted with a single modification as to compensation. *Held*, that an amendment to conform to such finding and to the proofs did not state a new cause of action, but was within the fact basis of the original bill, and was properly allowed.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 561–563; Dec. Dig. ⬤—273.]

2. EQUITY ⬤—273—AMENDMENT OF BILL—WHAT CONSTITUTES NEW CAUSE OF ACTION—"DEPARTURE."

An amendment of plaintiff's pleading constitutes a "departure" from the original cause of action only where the pleader deserts in point of fact the ground that he had first taken, or where he puts the same facts on a new ground in point of law.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 561–563; Dec. Dig. ⬤—273.

For other definitions, see Words and Phrases, First and Second Series, Departure.]

3. RAILROADS ⬤—159—STATUTORY LIEN FOR CONSTRUCTION—TAKING COLLATERAL SECURITY.

Defendant, a newly organized electric railway company, without money in its treasury, entered into a contract for the building of a portion of its road, by which it agreed to sell stock at par to the amount of $75,000, the same to be paid to the contractor as the work progressed. It further agreed that such sum should be deposited in bank within 60 days, or "approved subscriptions for the said sum," acceptable to the contractor, should be procured. A short time before the expiration of the 60 days the promoters, who controlled the corporation, signed a paper by which they agreed to take or sell stock to the required amount, the proceeds to be used according to the terms of the contract. *Held*, that such agreement was in execution of the obligation of defendant to procure approved subscriptions, and that, since money paid thereon would become the property of the corporation, the fact that it would create a fund that could be used to pay the contractor did not constitute it a collateral security taken by the contractor, which deprived him of his statutory right to a lien for work done under the contract.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 477, 486–504; Dec. Dig. ⬤—159.]

4. CONTRACTS ⬤—280—CONTRACT FOR BUILDING RAILROAD—PRACTICAL CONSTRUCTION—ESTOPPEL.

Prior to the making of a contract for the construction of a railroad, the contractors had been employed on the work, which the company had commenced, and which was being done in accordance with the plans, profiles, and grades which had been made by an engineer then on the work. By the contract the company agreed to furnish the plans, profiles, and grades, but no others were furnished, and the contractors proceeded under those previously in use. *Held*, that the company was estopped to

deny, after the work had been done, that such profile was the one intended by the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1249–1280; Dec. Dig. ☜280.]

Appeal from the District Court of the United States for the Northern Division of the Southern District of Illinois; J. Otis Humphrey, Judge.

Suit in equity by Patrick A. Hart and Charles F. Hart, doing business as P. Hart & Sons, against the Galesburg & Kewanee Electric Railway Company. Decree for complainants, and defendant appeals. Affirmed.

This is a suit to foreclose a mechanic's lien under the following provision of the Illinois Statutes:

"7183. For fuel, ties, material, supplies. Section 1. Be it enacted by the people of the state of Illinois, represented in the General Assembly, that all persons who may have furnished, or who shall hereafter furnish to any railroad corporation now existing, or hereafter to be organized under the laws of this state, any fuel, ties, material, supplies, or any other article or thing necessary for the construction, maintenance, operation or repair of such roads, by contract with said corporation, or who shall have done and performed, or shall hereafter do and perform any work or labor for such construction, maintenance, operation or repair by like contract, shall be entitled to be paid for the same as part of the current expenses of said road; and in order to secure the same, shall have a lien upon all the property, real, personal and mixed, of said railroad corporation as against such railroad, and as against all mortgages or other liens which shall accrue after the commencement of the delivery of said articles, or the commencement of said work or labor: Provided, suit shall be commenced within six months after such contractor or laborer shall have completed his contract with said railroad corporation, or after such labor shall have been performed or material furnished." Jones & A. Ann. St. 1913, § 7183.

After the issues were formed the cause was referred to a master, who reported his findings of fact and conclusions of law. These were approved by the court, and thereupon a decree was entered finding that $15,673.27 was due to complainants, and awarding them a foreclosure of the statutory lien.

We summarize the facts, found by the master and approved by the court, as follows:

In the spring of 1902 a number of gentlemen contemplated the building of an electric railroad from Kewanee, through Weathersfield and Galva, to Galesburg, in the state of Illinois. On May 20, 1902, they duly incorporated the appellant company under the general railroad incorporation act of Illinois.

Not having the means to build the road, their first step was to find some one who would undertake to finance the enterprise. And on June 25, 1902, appellant entered into a contract with Brandenburg, of New York, by which they put the control of the building of the road into his hands. Among the conditions to be performed by appellant was the following:

"Third. To sell seventy-five thousand dollars ($75,000) of the said three hundred thousand dollars ($300,000) of the capital stock allotted for these lines for the sum of seventy-five thousand dollars ($75,000), the same to be paid the parties of the second part for construction and equipment as follows:

"That is, the parties of the second part shall at the end of each month present a statement to the parties of the first part, covering the cost of labor and material used in the construction of the said lines up to the date of the presentment of said statement and the parties of the first part shall pay 85% of the amount so named and so on each month until the said sum of seventy-five thousand dollars ($75,000) is paid; however, the cost of the right of way is to be a part of the said seventy-five thousand dollars ($75,000), the said

cost not to exceed five thousand dollars ($5,000). The said seventy-five thousand dollars ($75,000) shall be raised by selling at par the stock of the said Galesburg & Kewanee Electric Railway Company and the money derived from time to time from said sales shall be deposited in a savings bank in the city of Galesburg, Ill., where same shall draw interest at the rate of 3%. The said sum of seventy-five thousand dollars ($75,000) to be derived from the sale of the stock of said company shall be deposited in a bank as aforesaid within sixty days or approved subscriptions for the said sum acceptable to the parties of the second part."

On August 15, 1902, the promoters of the enterprise signed and delivered to Brandenburg the following paper:

"Whereas, on the 25th day of June, A. D. 1902, there was an agreement entered into by and between H. W. Crane, of Oneida, Illinois, and W. D. Godfrey, of Galesburg, Illinois, acting for and in behalf of the Galesburg & Kewanee Electric Railway Company, a corporation existing under the laws of the state of Illinois, designated as parties of the first part, and Henry Voorce Brandenburg & Company, incorporated, a corporation existing under the laws of the state of New York, named as party of the second part; and whereas, in said agreement it was stipulated that the parties of the first part would guarantee the sale of $75,000 worth of stock of the Galesburg & Kewanee Electric Railway Company; and whereas, it was further agreed that the money thus derived from the sale of said stock would be paid to the party of the second part in installments of 85% a month of the cost of labor and material from time to time used in the construction of a proposed street railway in Kewanee and between Kewanee and Galva:

"Now, therefore, we, the undersigned, in consideration of the payment of $1.00, the receipt whereof is hereby acknowledged, do herein agree to take the said $75,000 stock, or sell said amount of stock of the Galesburg & Kewanee Electric Railway Company and pay the proceeds derived therefrom, or the money advanced on account of this agreement, to the said party of the second part according to the terms of the agreement hereinabove mentioned; a copy of the paragraphs referred to being herewith attached and made a part of this agreement."

After this paper was delivered to Brandenburg, he should have gone ahead with the construction of the road; but, prior to November 18th, he had done nothing beyond sending engineers to Kewanee to make surveys and estimates of the cost of construction. As the franchise of appellant might be forfeited unless work was under way before the end of the year, appellant itself, though tied hand and foot by its contract with Brandenburg, began some efforts at construction prior to November 18th, and was continuing such work on that day.

On November 18, 1902, appellees, the directors of appellant, and one Brown, as agent of Brandenburg, met at Galesburg. At this meeting a draft of a contract, containing specifications for the construction of the road, was drawn. This contemplated that Brandenburg should employ appellees and that appellant should approve. Appellees and appellant then and there signed the paper, but Brown did not then sign for Brandenburg. At that meeting, however, Brown, on behalf of and in the name of Brandenburg, assigned and turned over to appellees the paper which had been signed and delivered to Brandenburg by the promoters, who controlled appellant. Brown took the copies of the contract, signed by appellees and appellant, to New York for Brandenburg's signature. At the same meeting it was agreed that appellees should immediately proceed with the construction of the road. One of the provisions of the Brandenburg contract was that, if Brandenburg for any reason was unable to carry out the contract, appellant should enter into an exactly similar contract with appellees for the construction of the road.

On November 19, 1902, appellees took over the construction of the road from appellant under the aforesaid temporary arrangement and continued work thereunder until December 5, 1902. On that day Brown met the directors of appellant in Chicago and informed them that Brandenburg would not go on with the enterprise on the lines indicated by Brown at the meeting on November 18, 1902, and proposed that Brandenburg would release all of his rights under the contract of June 25, 1902, if appellant would pay him $4,000. Thereupon that amount was paid and Brandenburg stepped out. And on the

same day an oral agreement was entered into between appellees and appellant by the terms of which appellees agreed to construct, equip, and put in operation an electric railroad through Kewanee to Weathersfield, and to grade the line from Weathersfield to Galva, in accordance with the specifications set forth and contained in the proposed contract of November 18, 1902, and to do and furnish such extras in and about the construction of the railroad as appellant might direct, in consideration of the payment to appellees by appellant of $75,000, and additional sums for such extras as appellant might order and direct appellees to do and furnish, said payments to be made monthly as the construction of said railroad and the doing of said work progressed, in the manner provided for in said proposed contract of November 18, 1902.

Under this oral contract of December 5, 1902, appellees continued with the construction of the road until it was completed and turned over to appellant on October 18, 1903.

Throughout this construction period appellees rendered monthly estimates to appellant; and upon such estimates appellant made considerable payments from time to time, but was always behind in its payments, and was always promising to catch up. During all of this time, and down to March 28, 1904, when a considerable balance, long overdue, was still unpaid, no criticism of the character of the construction had ever been made by any representative of appellant. On that day appellant tendered to appellees a check for $14,210.68, together with a statement showing the items and amounts of extras that appellant was willing to allow. At the end of the statement was this sentence: "This bill is allowed by the railroad company provided you finish the grade to Galva." At the same time or immediately thereafter appellant served a written notice upon appellees, excluding them from the railroad line.

On April 14, 1904, within six months from the conclusion of the work, this suit was commenced.

Six grounds of attack upon the decree are presented by appellant. These, together with such further details as may be necessary, are considered in the opinion.

George W. Manierre, of Chicago, Ill., for appellant.

A. F. Reichmann, of Chicago, Ill., for appellees.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). [1] I. Appellees filed their original bill on April 14, 1904. On March 3, 1914, appellees were permitted by the court to file certain amendments to the bill. These amendments were required by the court and made by appellees on the theory that they were proper, and probably necessary, in order to make the pleadings conform to the facts as established by the proofs. Appellant, however, insists, first, that the original bill was based upon the contract of November 18, 1902, as a written contract, and that the bill as amended was bottomed on the oral contract of December 5, 1902, and that, therefore, a new and different cause of action was stated, which was barred by limitation and laches; and, second, that in any event it was error, under the equity rules, to permit the amendment.

These contentions require a consideration of the pleadings and proofs as they stood prior to the amendment. The original bill was not, as appellant insists, based upon the contract of November 18, 1902, as a written contract between appellant and appellees under which the work was done. As a premise, the bill alleged that appellees and Brandenburg entered into the contract of November 18, 1902, with appellant's approval, and that shortly thereafter, on December 5, 1902, appellant bought out Brandenburg and procured its release from all

obligations to him. And upon this premise the bill proceeded to charge that thereby Brandenburg became unable to carry on the construction as contemplated, and that thereupon appellant became legally obligated to enter into a contract with appellees for the completion of the railroad in accordance with the terms of the writing of November 18, 1902. The proofs showed that Brown, after appellant had bought out Brandenburg and before suit was instituted, signed the writing of November 18, 1902, as agent of Brandenburg. The master found it unnecessary to determine what, if any, legal obligations existed between the parties prior to December 5, 1902, because he found that on that date the parties had orally agreed, as they had a right to do, to certain terms which would work a slight modification of the pre-existent legal obligations, if such there were. Appellees were earnestly insisting during the taking of the proofs that at the meeting of December 5, 1902, appellant had orally agreed with them that they should continue the construction according to all of the terms and conditions of the writing which had been signed by appellees and approved by appellant on November 18, 1902. On the other hand, appellant, through its promoters, was contending that at the meeting of December 5, 1902, appellees had agreed to build a railroad "of standard construction" through Kewanee to Weathersfield, and to grade the line from Weathersfield to Galva for the gross sum of $75,000, with additional payments for extras ordered by appellant. Appellant was bringing forward this testimony to sustain its answer and also a cross-bill under which it was claiming damages for appellees' failure to build a railroad "of standard construction." The master found that at the meeting of December 5, 1902, the parties had agreed that all of the terms and conditions and specifications of the writing of November 18, 1902, should be observed on both sides except as to compensation. In the writing of November 18, 1902, the price per mile for completed road was $15,942, and the price for grading beyond where the road was completed was $3,000 per mile. At those rates the work would have come to $78,202.07. The master found that these rates were modified at the meeting of December 5, 1902, so that, while grading should be paid for at the rate of $3,000 per mile, the completed work was to be enough less so that the whole work, exclusive of extras, should aggregate $75,000. This finding was counter to the contention of appellant that no plans and specifications or terms or conditions of pay had been agreed upon, and that appellant was to pay $75,000 for "standard construction." The amendment to the bill was drafted by appellees to cover their acquiescence in the master's finding that, while the parties had accepted the writing of November 18, 1902, in all other respects, they had diminished the gross compensation by $3,202.07. The bill as amended recites the same premises with regard to the situation between appellant and Brandenburg, and the same act of appellant in eliminating Brandenburg from the situation, and then proceeds to charge that on December 5, 1902, the parties adopted the writing of November 18, 1902, in all respects except as to compensation, which was reduced to $75,000.

In our judgment the bill as amended does not set up a new and different cause of action. It is to be observed that the statute gives a

lien to all persons who do work or furnish materials for a railroad "by contract with said corporation." If the railroad corporation has contracted for the work—in other words, if the contractor is not an interloper—the statute gives a lien. This statutory right was the law basis of the original bill, and it was likewise the law basis of the bill as amended. The original bill asserted, as a fact basis, that the writing of November 18, 1902, became, by reason of the circumstances and the acts of the parties, the expression of all the terms and conditions of the contract under which appellees did the work for which appellant had failed to pay. The bill as amended asserted, as a fact basis, that the writing of November 18, 1902, became, by reason of the circumstances and the acts and the oral agreements of the parties, the expression of all the terms and conditions of the contract except that the consideration was reduced $3,202.07. Instead of the amendment bringing forward a new and different cause of action, it seems to us to make merely a slight change in stating the details of the original fact basis of the cause of action.

[2] Between stating a new cause of action and amending the details of the original cause of action, the difference is vital and is clearly illustrated by the leading cases. Departures occur either where the pleader deserts, in point of fact, the ground that he had first taken, or where he puts the same facts on a new ground in point of law. Union Pacific Railway Co. v. Wyler, 158 U. S. 285, 15 Sup. Ct. 877, 39 L. Ed. 983, is an instance of departure from law to law. Wyler, an employé of the railway company, was injured through an act of a fellow employé. For this there would be no liability on the part of the railway company at common law unless the fellow employé was incompetent and his incompetency was known to the railroad company, which nevertheless continued him in its service, and unless such incompetency was unknown to Wyler. Wyler alleged that his fellow employé was incompetent, failed to state that his fellow servant was negligent in performing the injurious act (unless such negligence was to be inferred from the previous allegation regarding incompetency), charged that the railroad company knew of the fellow employé's incompetency, and nevertheless retained him in its service, and averred that Wyler neither knew nor was chargeable with knowledge of the incompetency of his fellow servant. In his amended declaration he charged that he was injured through the negligent act of a fellow servant, and that a statute of Kansas, within which state the injury was inflicted, made the railroad company liable to Wyler for the negligent act of the fellow employé, regardless of his incompetency and of knowledge thereof. Though the same injury was involved in both pleadings, there was a clear departure from law to law, and it was held that a plea of the statute of limitations was a good defense to the new cause of action. Whalen v. Gordon, 95 Fed. 305, 37 C. C. A. 70, was another case of the same kind. The original declaration sought the recovery of damages for an alleged breach of warranty in a contract of sale, while the amended pleading alleged a rescission of the sale on account of fraud and sought to recover the purchase price paid. Here again, though the same transaction between the same parties was involved, there was a clear departure from law to law. War-

ner v. Godfrey, 186 U. S. 365, 22 Sup. Ct. 852, 46 L. Ed. 1203, illustrates the desertion by the pleader of the ground originally taken in point of fact. Complainant Godfrey had been induced by fraudulent and criminal practices, and without consideration, to convey her land to one Dutton. Dutton had conveyed to Warner and Wine. The original bill, as first amended, charged that Warner and Wine had taken title with full knowledge of Dutton's fraud, and sought a decree for the unconditional recovery of the property. Warner and Wine denied knowledge of Dutton's fraud and averred that they were good-faith purchasers for value. On the trial of this issue there was a finding in favor of Warner and Wine. Pending the hearing Warner and Wine disclosed that the deed to them was for security, and they offered to convey the property to complainant upon being reimbursed the money they had actually expended; but this offer was declined by complainant, who persisted in prosecuting her demand for an unconditional recovery. After the adverse finding, complainant filed an amended bill, in which the ground of fact stated against Warner and Wine was that they had taken title in good faith and for value, but only as security, and asked to be allowed to redeem. Clearly this was an abandonment of the fact basis of the original bill.

On the other hand, the case of Texas & Pacific Railway Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905, 36 L. Ed. 829, shows the difference between a departure from the original cause of action, either in law or in fact, and a variance between pleadings and proof within the original basis of law and fact. Cox, a freight conductor, was killed while attempting to couple cars. The original declaration charged negligence on account of the "defective condition of the cross-ties and of the roadbed." The amended declaration charged that Cox was injured "on account of the drawhead and coupling pin not being suitable for the purposes for which they were to be used; he being ignorant thereof, and the defective condition of the tracks." In this case it was held that there was no departure from law to law and no departure from fact to fact. The legal right, the statutory liability of the railway company to account for the wrongful death of Cox, was the same in both declarations. The broad basis of fact, namely, that Cox without fault on his part was injured through the negligence of the railway company with respect to the appliances with which he was working at the time, taken in the first declaration, was not abandoned in the second. It is true that new details respecting faults in the equipment were brought forward; but these were mere changes, necessary to meet the proofs, within the fact basis of the original action, and did not constitute an abandonment of that basis. In our judgment this last case announces the rule that is applicable here. There was no departure from law to law; the same basis of legal right was asserted throughout the case. Nor was there a departure from fact basis to fact basis. Throughout the hearing on the original pleadings it was clear that appellees had done construction work upon appellant's railroad; that appellees were not volunteers, but had done the work under contract with appellant; that a large sum remained due and unpaid; and that, while appellees were contending in the proofs that appellant had adopted the writing of November 18, 1902,

in all respects, and while appellant was contending that that writing had not been adopted in any respect, the master found upon the conflicting evidence that the writing of November 18, 1902, had been adopted by the parties in every respect except that a modification had been made in the gross amount of compensation. Under these circumstances we believe that the trial court was right in holding that this was not a departure, but only amounted to a variance between the pleadings and proofs within the original fact basis, and that such a variance might be cured by amendment, or even might be deemed cured without amendment.

Appellant's point that appellees in making the amendment should have complied with old equity rule 29 is not well taken. New equity rule 19 (198 Fed. xxiii, 115 C. C. A. xxiii) was in force at the time the amendment was made and it governed the matter. Even under the old rule 29 the allowance of an amendment to cure a variance was within the discretion of the court.

[3] II. That appellees waived their lien by accepting security for the payment of the contract price is strongly urged by appellant. In the master's report the paper that was signed by the promoters on August 15, 1902, and delivered to Brandenburg, is called "a contract of guaranty." If this paper in truth constituted a collateral security for the performance of appellant's contract, appellees might encounter an insuperable difficulty, because under the Illinois law (Lyon Lumber Co. v. Equitable Loan Co., 174 Ill. 31, 50 N. E. 1006), the taking of collateral security waives the lien unless it is expressly preserved. But calling the paper a contract of guaranty or collateral security does not affect its real nature. In the Brandenburg contract appellant, a paper corporation with no funds in its treasury, bound itself to sell $75,000 of stock at par and to deposit this sum in bank at interest and therefrom to make payments for the construction of the road, and further to sell that amount of stock and deposit the money within 60 days, or to procure "approved subscriptions for the said sum acceptable to the parties of the second part." It was in execution of this obligation of appellant that the promoters signed the paper of August 15, 1902; and that paper was delivered to Brandenburg under appellant's contract to procure "approved" stock subscriptions, and because Brandenburg or the actual constructor of the road was chiefly interested in preserving the evidence. In that paper the promoters agreed to take $75,000 of stock or to sell that amount, and agreed that the proceeds derived from sales of stock "or the money advanced on account of this agreement" should be paid according to the terms of appellant's contract with Brandenburg of June 25, 1902. Under the contract of June 25, 1902, the only way that money could be paid from the fund in bank, derived from the sale of stock, was on the orders of appellant itself. The paper of August 15, 1902, contemplated no other method of payment. The liability of the promoters, therefore, was directly to appellant on account of their written undertaking to take stock and pay the money therefor into the treasury of appellant. The provision that they might sell stock only gave them the right to substitute or bring in additional persons as stock subscribers. The provision respecting "money advanced on account of this

agreement" could not refer to any money other than that paid to appellant on account of their obligation to take stock, which money might be advanced or paid in by them to appellant prior to the issuance of stock to them. This paper, therefore, instead of being a guaranty or a security collateral to appellant's contract obligation to pay for the building of the road, was merely the creation of a special fund belonging to appellant itself, to result from the sale of stock, the consideration for which could legally go only into appellant's treasury. That a provision for the creation of a particular fund out of which payments under the contract are to be made is not the giving of collateral security, is decided in Meyer v. Construction Co., 100 U. S. 457, 476, 25 L. Ed. 593.

[4] III. The paper of November 18, 1902, which on December 5, 1902, was adopted by the parties, for governance of construction work, provided that:

"All surveys and stakes with plans, profiles, and grades to be furnished by company's engineer, as per drawing shown at Kewanee, October 25, 1902."

The master found that appellant during the summer of 1902, while the Brandenburg contract was in force, had an engineer named Richey prepare a profile of the grade from Weathersfield to Galva. In August or September Brandenburg had an engineer named Pierson prepare a new profile by making modifications of the Richey profile. Appellees came into possession of the Pierson profile and constructed the road in accordance with that document. Appellant supposed that the road was to be built in accordance with the Richey profile. On this basis appellant contends that there was no meeting of the minds on the matter of profile, hence no express contract, hence no liability, except on the basis of quantum meruit. But there can be no misunderstanding with respect to appellant's contractual obligation to furnish the profile in accordance with which appellees should do the work. The contract between the parties was made on December 5, 1902. Prior to November 18, 1902, appellant had begun construction work in which Pierson, Brandenburg's engineer, was participating. For a month prior to that time Glathart, an assistant to Pierson, was on the ground. When appellees took over the work from appellant on November 19, 1902, they kept Glathart on the work. So when appellees were doing work in a provisional way between November 19, 1902, and December 5, 1902, they were performing the work in accordance with the Pierson profile. Such was the situation and relation of the parties when the contract of December 5, 1902, was made. Appellant, by failing then to furnish the Richey profile or another profile in place of the one in accordance with which appellees had been working ever since taking the work out of appellant's hands, gave a practical construction to the profile clause of the paper of November 18, 1902, which was adopted on December 5, 1902, as the basis on which appellees should continue the construction. In our judgment, therefore, appellant had no legal right to assume that the work would be done in accordance with the unproduced Richey profile, and should not be heard to deny that the Pierson profile was the one mutually intended in the contract of December 5, 1902.

IV. The master and the court overruled appellant's contention that the evidence established a failure on the part of appellees to perform the work in substantial compliance with the contract. This is merely a question of fact. From a study of the master's report and an extended examination of the evidence we find that appellant has fallen far short of discharging the burden of demonstrating a clear error on the part of the master.

V. Three small items included in the master's allowance of extras are objected to on the ground that they are not lienable. In appellant's exceptions to the master's report directed against both his findings of fact and his conclusions of law, these matters were not mentioned. They were not brought to the attention of the trial court by any exception or motion filed therein. They were not made the ground of any assignment of errors. Therefore we shall not examine the correctness of their allowance. Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658.

VI. A further urge is that appellees forfeited all right to a standing in equity by making fraudulent and unconscionable claims. Conceding that a party who knowingly and willfully sets up false statements of material matters may thereby forfeit his lien, we are not impressed that such a principle has any application to the facts of this case. While appellees failed to recover for some items of extras that they claimed, a study of the entire case convinces us that from beginning to end they prosecuted their suit with the utmost good faith, and that they are not to be charged any more than appellant, which also failed in many of its contentions of fact, with fraudulent conduct.

The decree is affirmed.