## DAVIS v. GATES.

### In re GATES.

(District Court, M. D. Pennsylvania. June 8, 1916.)

No. 180.

1. BANKRUPTCY ⊜⟹292—SUIT BY TRUSTEE—JURISDICTION.
   Under Bankruptcy Act July 1, 1898, c. 541, § 70e, 30 Stat. 565 (Comp. St. 1913, § 9654), and section 23b, as amended by Act June 25, 1910, c. 412, § 7, 36 Stat. 840 (Comp. St. 1913, § 9607), a District Court has jurisdiction of a suit by a trustee to recover property fraudulently transferred by the bankrupt without the consent of the defendant. Such a suit is also cognizable in equity.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 410, 413, 415, 416; Dec. Dig. ⊜⟹292.]

2. FRAUDULENT CONVEYANCES ⊜⟹155, 269(1)—ELEMENTS OF FRAUD—INTENT.
   To justify the setting aside of a deed for fraud, there must have been fraud on the part of the grantor, participated or acquiesced in by the grantee, which must be not only proved, but particularly alleged.
   [Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 493, 789–794; Dec. Dig. ⊜⟹155, 269(1).]

---

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3.** EQUITY ⬳288—PLEADING—AMENDMENT TO MEET EVIDENCE.

Where evidence has been fully taken without objection on an issue not made by the pleadings, complainant may be permitted to amend his bill to meet the evidence and present such issue.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 547; Dec. Dig. ⬳288.]

**4.** BANKRUPTCY ⬳284—FRAUDULENT CONVEYANCE—SUIT TO RECOVER PROPERTY.

It is to be assumed, in the absence of proof to the contrary, that a trustee in bankruptcy has been injured by a conveyance made by the bankrupt in fraud of his creditors, and it is unnecessary for the trustee to obtain judgment as a condition to maintaining a suit for recovery of the property.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. ⬳284.]

**5.** FRAUDULENT CONVEYANCES ⬳299(1)—SUIT TO SET ASIDE—EVIDENCE OF FRAUD.

In a suit to set aside a fraudulent conveyance, where the fraud must necessarily be shown largely or entirely by circumstantial evidence, such evidence must be considered in its entirety, without giving undue importance to isolated facts.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 876; Dec. Dig. ⬳299(1).]

**6.** FRAUDULENT CONVEYANCES ⬳299(13)—RECOVERY OF PROPERTY BY TRUSTEE—EVIDENCE.

Evidence considered, and *held* sufficient to establish that a conveyance of property by a bankrupt and his mother was without consideration, and made solely for the fraudulent purpose of covering and protecting the property from present and future creditors, to which purpose the grantee was a party, and that the property was recoverable by the bankrupt's trustee as a part of his estate.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 890; Dec. Dig. ⬳299(13).]

**7.** FRAUDULENT CONVEYANCES ⬳69(1)—GROUNDS OF INVALIDITY—INTENT TO DEFRAUD SUBSEQUENT CREDITORS.

A voluntary conveyance is fraudulent and voidable as to subsequent creditors, where it appears that the grantor intended to withdraw the property from the reach of such creditors.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 178–180; Dec. Dig. ⬳69(1).]

**8.** WILLS ⬳634(14)—VESTED REMAINDERS.

Under a will giving to the two sons of testator a life interest in real estate, with remainder to his grandchildren, "not only those now born, but who shall be hereafter born," to be equally divided among the grandchildren living at the death of the survivor of the two sons, bankrupt, who was a grandchild living at the time of the death of the testator, took a vested interest, which passed to his trustee in bankruptcy.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 1502; Dec. Dig. ⬳634(14).]

In Equity. Suit by B. W. Davis, trustee of the estate of Charles B. Gates, bankrupt, against Loretta Gates. Decree for complainant.

Clarence D. Coughlin and G. Fred Lazarus, both of Wilkes-Barre, Pa., for plaintiff.

Thomas D. Shea, of Nanticoke, Pa., and Frank McCormick, of Wilkes-Barre, Pa., for defendant.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

BRADFORD, District Judge. [1] The bill in this case was filed October 28, 1913, by B. W. Davis, trustee of the estate of Charles B. Gates, a bankrupt, and seeks to have a certain deed of real estate bearing date February 1, 1912, executed by Charles B. Gates, prior to his bankruptcy, to Loretta Gates, the defendant, declared fraudulent as against his creditors and set aside and annulled, and to have the defendant ordered and decreed, among other things, to execute and deliver to the plaintiff a deed of conveyance of the real estate, so far as undisposed of, fraudulently transferred to her as alleged, and have an accounting by her to the plaintiff for all moneys received by her from the sale of any portion or portions of the real estate so transferred to her by the bankrupt. In the answer as amended the jurisdiction of this court over this proceeding is challenged on the ground that the deed in question was executed more than four months prior to the filing of the petition in bankruptcy and the defendant has not "consented in any form or manner to the bringing of this action." This position is untenable. The bill is founded on section 70a, section 70e and section 23b of the Bankruptcy Act (Comp. St. 1913, §§ 9607, 9654). Section 70a provides that the trustee upon his appointment and qualification shall be vested with the title of the bankrupt as of the date of the adjudication to "(4) property transferred by him in fraud of his creditors." Section 70e is as follows:

"e. The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of the adjudication. Such property may be recovered or its value collected from whoever may have received it, except a bona fide holder for value. For the purpose of such recovery any court of bankruptcy as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."

Section 23b is as follows:

"Suits by the trustee shall only be brought or prosecuted in the courts where the bankrupt, whose estate is being administered by such trustee, might have brought or prosecuted them if proceedings in bankruptcy had not been instituted, unless by consent of the proposed defendant, except suits for the recovery of property under section sixty, subdivision b, and section sixty-seven, subdivision e, and section seventy, subdivision e."

Section 23b as originally enacted concluded with the words "unless by consent of the proposed defendant." The words "except suits for the recovery of property under section sixty, subdivision b, and section sixty-seven, subdivision e," were added by way of amendment February 5, 1903. But it was not until 1910 that the further words "and section seventy, subdivision e," were added. This suit is not under section 60b or section 67e, and therefore, had it been brought prior to the amendment of 1910, it could not have been maintained without the consent of the defendant. Having been instituted after that amendment, however, it not only appears from the face of the statute, but is to be gathered from the cases, that consent by the defendant was not necessary to the maintenance of the suit. But were it otherwise, the defendant clearly has consented. The bill was filed

October 28, 1913, and she, without objecting in any manner, appeared generally November 13, 1913, and about the same time through her solicitor entered into a stipulation for an extension of time for filing her answer, and thereafter filed the same November 17, 1913. All this was done by her without objection or any manifestation of dissent on her part. She must, therefore, under the authorities, be held to have consented to the bringing of this suit against her. She cannot avail herself of her objection made for the first time February 18, 1915. Having consented, it was then too late to object.

An objection has been taken to the jurisdiction of this court over this suit on the ground that there is a complete and adequate remedy at law; but, in view of the character of the suit and the nature of the relief sought, this contention is clearly without merit.

[2, 3] It is further contended by the defendant that the bill cannot be sustained for the reason that she is not charged in the pleadings to have been a participant in the fraud alleged against the bankrupt, Charles B. Gates, her son. The bankrupt became such September 23, 1913, on his own petition, and the deed assailed as fraudulent was executed either in February or in May, 1912. Under these circumstances it is undoubtedly true that if the defendant accepted the deed from him for a valuable and adequate consideration moving from her and was not a party to and was wholly innocent of any fraud intended or practised by him against his creditors, then or thereafter existing, it would be necessary to dismiss the bill. The bill alleges that "the conveyance aforesaid of the bankrupt to the defendant was voluntary and was without consideration"; that at that time "the bankrupt was engaged in or was about to engage in a hazardous business"; that the plaintiff verily believed and expected to be able to prove that the defendant "is not an innocent purchaser for value of said estate of Charles B. Gates, bankrupt, and that the transfer of said interest unto the defendant by the bankrupt was fraudulent and was made with an intent to hinder, delay and defraud the creditors of the said Charles B. Gates, then existing, as well also as all subsequent creditors"; and that the deed in question transferred "all of the bankrupt's right, title, and interest in all of the property, real or otherwise, situated in Luzerne County, said district, devised and bequeathed and which the said bankrupt inherited in and under the wills of his grandfather, John R. Gates, and his grandmother, Mary A. Gates." But while the bill charges fraud against the bankrupt, it nowhere alleges that the conveyance was procured or received by the defendant with an intent or understanding on her part that creditors should thereby be defrauded. To justify the setting aside of the deed there must have been fraud on the part of the grantor participated or acquiesced in by the grantee. Gottlieb v. Thatcher, 151 U. S. 271, 14 Sup. Ct. 319, 38 L. Ed. 157; Horbach v. Hill, 112 U. S. 144, 148, 5 Sup. Ct. 81, 28 L. Ed. 670; Jones v. Simpson, 116 U. S. 609, 6 Sup. Ct. 538, 29 L. Ed. 742; Lloyd v. Williams, 21 Pa. 327; Rechling v. Byers, 94 Pa. 316; Knower v. Cadden Clothing Co., 57 Conn. 202, 17 Atl. 580. Fraud is not to be presumed. Not only must it be satisfactorily proved, but particularly alleged. Not having been charged against the defendant, on

the pleadings as they now stand there could be no decree against her. Notwithstanding the omission to plead fraud on her part no exception or objection was during the production of evidence taken or made by her on that ground, and both parties have gone into evidence on the subject of the existence or non-existence of fraud as fully to all intents and purposes as if fraud had been properly charged against her; and if the proofs clearly show fraud on her part in the transaction the exercise of sound judicial discretion should require that leave be granted the plaintiff to so amend the bill as to make it harmonize with the case as made on the evidence, to the end that a decree may be made in accordance with the merits.

The broad question involved is whether on the evidence and the principles of equity as administered by this court and by the courts of Pennsylvania the deed bearing date February 1, 1912, should be permitted to stand as against the trustee in bankruptcy. But aside from this central question a number of points have been raised in the case, to some of which reference has been or will be made.

[4] It is urged in behalf of the defendant that no decree can be made against her as it has not been affirmatively shown that, if she was guilty of fraud, injury has thereby resulted to the plaintiff or any creditor or creditors represented by him. It is a general rule that a decree setting aside a fraudulent conveyance will not be made at the instance of those who have suffered or will suffer no injury from the fraud. But the cases establishing the rule have no application here. The plaintiff is trustee in bankruptcy of the grantor in the deed, and an essential ground or condition of the adjudication is the existence of insolvency on the part of the bankrupt. Section 1a, cl. 15 (Comp. St. 1913, § 9585), defines insolvency as follows:

"A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

It is, therefore, to be assumed in the absence of proof to the contrary that the trustee as representing creditors has been injured by a conveyance executed by the bankrupt in fraud of his creditors. It is not necessary that the extent to which he has been so injured should be equal to the entire value of the property conveyed. Section 70a provides that a trustee upon his appointment and qualification shall be vested by operation of law with the title of the bankrupt, subject to certain exceptions not pertinent in this connection, to "(4) property transferred by him in fraud of his creditors"; and section 70e provides that "the trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder," etc. Power is thus conferred upon a trustee to recover all the property transferred in fraud of creditors, although such recovery may result in the possession by the trustee of property in excess of the entire indebtedness of the bankrupt. It is manifestly impracticable in

all cases to determine in advance the exact amount or proportion of the property fraudulently transferred, or its value, it is necessary should be received by a trustee to insure the payment in full of the bankrupt's indebtedness; and further, if the result of the recovery by a trustee would be to put in his possession assets more than sufficient to insure such payment in full, any surplus would be turned over under the direction of the court to the transferee or otherwise as justice might require.

The position taken by the defendant that it was necessary that the plaintiff before bringing suit to set aside the alleged fraudulent transfer should have recovered judgment, issued execution thereon and had it returned unsatisfied, is palpably unsound, since the provisions of the bankruptcy act and their operation are such as to exclude the possibility of obtaining judgment and return of execution as against the bankrupt.

The defendant invokes for her protection the long established rule that a sworn answer responsive to the allegations of the bill can be overcome only by the testimony of two opposing witnesses or of one witness and corroborating circumstances having probative force equal at least to the testimony of another witness. How far this rule can here be applied in view of the character of the pleadings is somewhat problematical. The answer is not and, of course, cannot be responsive to any charge of fraud made in the bill against the defendant; for the bill, as already said, contains no such charge. But though not strictly responsive to the bill the defendant has made allegations in her answer, original and as amended, tending to show good faith on her part in the transaction. In the answer as originally filed it is alleged that "the said deed was obtained for property for a good and valuable consideration," and in her answer as first amended that she was an innocent purchaser for value and in good faith of a contingent interest of the bankrupt in the property described or referred to in the bill, and in her answer as further amended that she denies that the deed in question was without consideration. In the peculiar situation created by the omission of the plaintiff to charge fraud against the defendant equity obviously requires that the same force should be accorded to the above statements of the defendant as if precisely the opposite had been alleged in the bill. Those statements, therefore, must be taken as true unless refuted by the testimony of two witnesses or of one witness and corroborating circumstances as above mentioned. The proof of fraud is not restricted to direct and positive evidence of the existence of the fraudulent intent, for the essence of fraud is secrecy and concealment and those meditating it do not proclaim their purpose from the housetop. To establish the secret intent it is necessary largely to rely upon circumstantial evidence, which frequently carries with it greater probative force than the direct testimony of many witnesses. Witnesses may agree upon a false story; but circumstances do not. To ask a witness in this case the bald question, "Had the defendant a fraudulent intent in accepting the deed from her son?" would be improper and inadmissible. It is at once necessary and sufficient to prove facts and circumstances from which

the fraudulent intent is clearly to be inferred. More than two witnesses have testified for the plaintiff as to facts tending to show fraud on the part of the defendant, and in addition thereto there is documentary evidence strongly pointing in the same direction. Thus there are not only two witnesses but corroborating circumstances in favor of the plaintiff, and the rule as to the effect of a sworn and responsive answer has been fully satisfied, if the evidence adduced by the plaintiff be sufficient to show that the deed in question was fraudulent as against the creditors of the bankrupt.

No statute of limitations bars this suit either directly or by analogy, nor has there been any laches on the part of the plaintiff; for within three weeks after his appointment and qualification as trustee the bill was filed.

Did the defendant or not intend or understand that the transfer to her should be merely colorable and that her son, the bankrupt, should in fraud of his creditors, notwithstanding the deed, have the benefit and enjoyment of the property covered by it? Or did she or not intend or understand that he should execute the deed as a means to effectuate a fraud upon his creditors then or thereafter existing?

[5] To reach a satisfactory conclusion on the questions of fraud involved in this case a comprehensive view should be taken of the evidence, direct and circumstantial, in its totality, and undue importance should not be given to any detached or isolated item of proof. In Montgomery Web Co. v. Dienelt, 133 Pa. 585, 19 Atl. 428, 19 Am. St. Rep. 663, the court reversed a judgment for error in a charge to a jury. Mr. Justice Mitchell in delivering the opinion said:

"Fraud, as has so often been said, can rarely be proved by direct and positive testimony, and great liberality is always allowed in the introduction of evidence having a tendency to show it. * * * Defendants had to get their testimony from the other side, and from the circumstances, and were not able to make positive and direct proof of the fraudulent intent, but had to rely upon circumstances pointing thereto. In his charge, the learned judge took these up seriatim, and disposed of them summarily. * * * The substantial defect of the charge is in its treatment of the items of evidence, one by one, without at any time directing the view of the jury to their united force. There probably never was a case of circumstantial evidence that could not be blown to the winds by taking up each item separately, and dismissing it with the conclusion that it does not prove the case. The cumulative force of many separate matters, each perhaps slight, as in the familiar bundle of twigs, constitutes the strength of circumstantial proof."

[6] A careful and protracted examination of the evidence has satisfied me beyond any reasonable doubt that the deed from the bankrupt to the defendant bearing date February 1, 1912, was executed by the former with intent to defraud his creditors existing at or after the time of its execution; that it was without consideration to support it; that the defendant fully and knowingly participated in and was a party to the fraudulent scheme; and that the plaintiff is, after so amending his bill as properly to charge fraud against the defendant, entitled to a decree. From the time of his birth until and including the final hearing in this case the bankrupt always lived with his mother and other members of his family, including father, brothers and sisters, in the "Gates Homestead," in Kingston, Luzerne County, Penn-

sylvania. He attained his majority May 29, 1911, and entered into co-partnership February 29, 1912, with William N. Bryden in the business of contracting for and building houses under the firm name of Bryden & Gates. The partnership continued until March 7, 1913, when it was dissolved by mutual consent. Within three months thereafter Bryden went into voluntary bankruptcy, and September 23, 1913, Gates also became a voluntary bankrupt. The deed to the defendant states the consideration therefor as "One hundred dollars and other valuable consideration," and covers lands in Luzerne County in which the bankrupt claimed an interest or share equal to that of each of his brothers and sisters under the wills of his paternal grandfather and grandmother. Two material questions in the case are, was there any real consideration for the transfer, and if so, what? and, when was the deed executed? It is contended for the defendant that there was a valuable consideration consisting of $6,000 loaned by the defendant to the bankrupt before the deed was executed, and that it was executed before the bankrupt entered the firm of Bryden & Gates. The aim of the defendant is to show that she in good faith paid a substantial and adequate money consideration for a transfer of the property to her before any creditors of that firm could have been in existence as such.

As witnesses the bankrupt and the defendant do not commend themselves to this court. Their testimony discloses such evasiveness, rashness of statement, and inconsistencies and improbabilities as not only to deprive it of weight, but strongly to tend to establish the plaintiff's case even in the absence of opposing evidence. By way of illustration reference may be made to the bankrupt's testimony as to plaintiff's exhibit No. 41, which is a petition to the Orphans' Court of Luzerne County by the guardian of the bankrupt and his sister Emily, setting forth that they were entitled respectively to two equal undivided fifth parts or shares in a portion of the lands and premises in that county belonging to the Gates estate, and praying for leave to sell the same to the Delaware, Lackawanna & Western Railroad Company for the purchase money therein mentioned. At the foot of this petition the defendant and other members of the family signed and sealed a declaration that they believed the statements of the petition to be true. It was offered in evidence by the plaintiff as an admission by the defendant of the bankrupt's interest in such lands and premises and as constituting a link in the plaintiff's chain of proof. The signature purporting to be that of the defendant was subsequently admitted by her counsel to be her genuine signature. With respect to the signatures on that exhibit the bankrupt testified as follows:

"Q. Now, I will show you complainant's exhibit No. 41, and show you page seven thereof, and I ask you whose signature is that? A. It says Loretta Gates. I don't know whether she signed it or not. Q. Whose handwriting is that, Mr. Gates? A. I don't know. The Court: Q. Don't you know the handwriting of your mother? A. No, I don't. Mr. Hourigan: Q. Did you ever see her write? A. I have seen her write, but I could not distinguish— Q. How many times have you seen your mother write? A. I don't know just how many times. Q. A hundred? A. I won't say. I don't know. Q. Two hundred? A. I won't say, I don't know. Q. Will you tell me whether you have seen your mother write once or one thousand times? A. I won't say

how many times I have seen her write. Q. Can you tell us whether it was once or a thousand times? A. No; I can't. Q. You don't know; you have no idea on that subject? A. No. Q. Whose signature is that first one? A. It says Frank R. Gates; but I don't know whether— Q. That is your father? A. My father's name is there. Q. Is that his signature? A. I won't say, I don't know. Q. You don't know?· A. No. Q. Whose is the third? A. It says John W. Gates, but I don't know whether he wrote that or not. Q. who is John W. Gates? A. My brother. Q. And you don't know whether that is your brother's signature or not? A. No; I don't. Q. Whose is the fourth name on there? A. Abram N. Gates. Q. Whose signature is that? A. His name is there, too, but I don't know whether he wrote that or not. Q. Is it his signature?· A. I would not swear to it. Q. Whose is the last signature on that· page? A. Mary A. Gates. Q. Who is that? A. Sister of mine. Q. Is that her signature? A. I don't know. I would not swear to it. · Q. Then you can't say whether any signature on page seven of this exhibit is in the handwriting of any of your family? A. That I don't know. * * * Mr. Shea: Q. Do you believe that is your mother's handwriting? A. No. Q. That is all we want to know. Do you know it is your mother's handwriting: just look at it? A. No."

This testimony is on a par with that given on the same subject by Frank R. Gates, the bankrupt's father, as follows:

"Q. I show you complainant's exhibit No. 41, page seven thereof, and I show you the second signature on that page: whose handwriting is that? A. I can't say. Q. Do you know? A. I don't. It don't look like a woman's writing, I don't know. Q. Whose is the first? A. That is mine. Q. You wrote that? A. Yes, sir. Q. Whose is the third? A. I can't say about that. It has been gone so long I can't say. I don't get no letters from him or anything. Q. Who is the John W. Gates there? A. Why, my son. Q. The fourth on there, who is that? A. Well,'it looks a little like his handwriting, and it doesn't. Q. Like whose handwriting? A. Like Abe's. Q. Is it Abe's or not? A. Well, that I can't say. It looks something like it, and it doesn't. Q. Whose is the last on that page?, A. That is Mary's. Q. Is that her signa-· ture? A. That is 'her signature. Q. Who is Mary? A. Why, my daughter. Q. Then on that page you can identify but two signatures? A. Yes, sir. Q. Yours and Mary's? A. No, no; my wife's and son's here, them two. Q. Oh, that is your wife's handwriting, is it? A. Well, I can't identify that. It looks like it and it doesn't look like it. Q. What will you say; is that your wife's handwriting, or not your wife's handwriting? A. Well, I could not say it is her handwriting. The Court: Q. Well, to the best of your knowledge? A. Well, I don't think it is."

On the subject of consideration for·the conveyance in question the testimony of the defendant before the referee in bankruptcy, which has been introduced into this case, is in part as follows:

"Q. You recite in this deed the consideration as having been $100.00 and other valuable consideration, was that true? A. $6,000. Q. You say in the deed $100.00 and other valuable consideration? A. The other valuable consideration would amount to $6,000.00. * * * Q. It wasn't true then that it was $100.00? A. No; it was for more than $100.00. Q. Why was that figure $100.00 put in there, do you know? A. I don't really know, because I don't know anything about law. * * * Q. You can't explain why $100.00 was put in there? A. He [William H. Hines] drew it in his office. Q. You never told him what he was to put in there as consideration, did you? A. No. Q. Did you ever discuss the subject of consideration with him? A. I did, about $6,000.00. Q. When did you discuss that? A. In January [1912]. Q. Did you tell him to put in $6,000.00? A. I think I did. Q. But you don't know why it was changed? A. No. Q. Did any money pass at the time this deed was drawn? A. Only the money I gave to him to get it recorded. * * * Q. The $100.00 wasn't paid over at that time either, at the time the deed was drawn? A. No. * * * Q. How long before this deed was drawn

had you paid the last money to your son, Charles Gates? A. I don't know as I could tell. Q. Was it a year? A. Oh, no. Q. Was it before he became of age? A. I gave him money before and after he became of age, for years, I gave him money right along for his schooling and traveling expenses, and for clothing. * * * Q. When did your son Charles B. Gates become of age, if you know? A. Four years ago last May. Q. That would be May 29, 1911, wouldn't it? A. Yes. Q. After he became of age what moneys did you give Charles? A. Right along, all the time I gave him money. Q. Then after he became of age, did you give him money? A. I couldn't tell you just when but I gave him money every month or something like that, whenever he asked me for it, I didn't give it to him, remember, I only loaned it to him. Q. When after he became of age did you loan him the first money to your knowledge? A. I couldn't tell you because I loaned him money all the time. Q. In what amounts? A. Sometimes I give him $100.00, sometimes $50.00, and sometimes $25.00, whatever he would ask for. Q. That is after he became of age you loaned him those various amounts? A. Yes. Q. Prior to the time he became of age did you loan him any money? A. I did. Q. What amount of money did you loan him then? A. You have the orders there, look at them. Q. That money was given through orders, was it, before and after he became of age? A. Some cash, some registered letters, and some orders. * * * Q. Mrs. Gates, you say that just prior to February when this deed was drawn you had a conversation with Senator Hines? A. I did in January, I told you. Q. Concerning the drawing of this deed? A. Concerning the drawing of that deed. Q. What did you tell Senator Hines at that time? A. I said I thought I needed my money back and I should have some of the money I loaned my son. Q. What did he say? A. He said he thought it was the right thing that I should do that. Q. That was the first time you took it up with the Senator, the question of Charles' paying back the money he borrowed? A. In January, yes. Q. That was the first time, was it? A. No, we spoke about it once or twice before that. Q. How long before that? A. Two or three months before that. * * * Q. Would you say it was in July? A. No, I think about October or November. * * * Q. What did you say at that time? A. I told him about Charles, the money I advanced him, and he said, 'I think you ought to have Charles do something in regards to getting your money back.' * * * Q. That is just prior to the drawing of this deed, October or November, just prior to the drawing of this deed, you mean? A. We didn't talk about the deed then, not until January. * * * Q. Did you lend any money to Charles B. Gates, your son, just prior to the time this deed was drawn? A. I did. * * * Q. How much did you lend him in January, 1912? A. I couldn't tell you that. Q. Was it $100.00? A. Yes, $200.00 or $300.00. * * * I didn't give him $100.00 at a time, maybe $25.00, $50.00 or $10.00. Q. Did you lend him any money in the preceding month of December, 1912 [1911]? A. Yes, sir; I did. Q. How much do you think you loaned him then? A. I would think I loaned him about $200.00 or $300.00. Q. For what purpose did you loan him this money in December and January? A. Because he took a trip and went to the city. Q. He needed money, did he? A. Yes, he said he did. He borrowed it of me with the intention of paying it back. Q. He didn't have any of his own at that time that he could use? A. No, not that I know of. Q. Not a cent that he could use? A. No, not a cent. Q. Did he borrow any money in November, 1911? A. He borrowed money all times of the year. I couldn't tell you when. Q. Did he borrow $700 subsequent to the time you talked to Senator Hines about his paying back? A. Yes, more than that. Q. When did you first talk with Charles about his making this deed? A. About the first of January, somewheres in January, about making out this deed, but I talked to him before that about trying to pay me back some way, and then in January we talked the whole thing over about his transferring the property over. Q. What did you say when you first talked to him about transferring all his property to you? A. I said I wanted my money back. I thought he ought to try and pay me in some way, and he said, 'I have no money, but I will transfer my property to you, we will have Mr. Hines come over,' and he did. * * * Q. Then you talked with Senator Hines about this several months before you talked to Charles? A. Two or three months. * * * Q. You first talked with

Charles B. Gates about this transferring of his interest in January you say, just prior to making of this deed? A. No, two or three months before that. * * * Q. What did Charles have to say to you in respect to the transferring of that estate? A. He said, 'I have not the money, but will transfer my property to you.' * * * Q. The $6,000.00 which you speak of as being the consideration in this deed was ascertained in what manner? A. In the money I loaned him. Q. How did you fix the amount as $6,000.00? A. I made an estimate of it. I knew how much I let him have. Q. How much of that $6,000.00 was advanced during the fall of 1911? A. I can't answer that question. Q. About how much? A. I can't answer that exactly because I don't know. Q. Was it $700.00? A. Yes; it was more than that. Q. Was it $800.00? A. I won't answer a question that I don't understand. Q. That would appear by reference to the orders, would it not? A. I should think some of it would, yes, but if I gave him money by cash, I didn't give everything by orders, if I had money in the house I would give it to him when he would ask me, or not give it to him, loan it to him. Q. How much do you suppose you gave him in cash in the fall, as much as $100.00? A. Yes, a couple thousand dollars. Q. In the fall of 1911? A. Not all in just the fall of 1911, I gave it to him right along, he had no income of any kind only what I gave him or lent him. Q. How much cash did you give him subsequent to the time he became of age? A. I couldn't exactly tell that. Q. Could you tell me about how much? A. I might have given him $2,000 or $3,000. Q. You figured up that all the money which you had given him approximated $6,000.00, did you? A. Yes, I did. Q. You arrived at that conclusion with Charles B. Gates, your son, did you? A. Yes. Q. He was willing it should be $6,000.00? A. Yes, he estimated it to be about $6,000.00. We took a rough estimate and I knew it was about that much. Q. You took the orders? A. No, I didn't have them. Q. Did Charles B. Gates have the orders? A. No, the bank had them. Q. How did you arrive at the sum of $6,000.00? A. I estimated it at that much. Q. Did you or Charles estimate it at that much? A. We both knew. * * * Q. Part of that $6,000.00 was made up in cash, part in orders? A. Part in orders and part in cash. * * * Q. When did you first begin to advance this money to Charles B. Gates making up this figure $6,000.00? A. When he went to school. Q. How old was he at that time? A. I think he was about nineteen. Q. About when to your knowledge was it? A. I think he was about nineteen, I couldn't tell exactly that. Q. Where was he when you advanced him that money? A. When he went off to school. I sent him to Mercersburg Academy that cost me about $800.00, and he went to Pierce Business College and Wood's Business College in Philadelphia, and to the Academy and Business College in Wilkes-Barre. Q. What did it cost you at those two business colleges? A. $600 or $800. Q. To those business colleges? A. Yes. Q. Then where did he go to? A. Wilkes-Barre Institute. Q. How long did he go there? A. A year. Q. Where did he go after he went to the Academy a year? A. Mercersburg. Q. How long was he at Mercersburg? A. One year. Q. After that year where did he go? A. Pierce's Business College in Philadelphia. Q. How long? A. A term. Q. A winter term? A. Yes. Q. Did he go to school subsequent to the time he became of age? A. He did. Q. Where to? A. Pierce's Business College. Q. He went in the fall, did he, after he became of age? A. Yes, in the fall, I think in September. Q. The fall of 1911? A. Yes, I think it was, I won't be sure about that. * * * Q. He spent four years at school for which you paid? A. Six years in school I paid. Q. Did you send the other children to school? A. No; only him. Q. Did the other children go to Wyoming Seminary? A. No. * * * Q. How many children have you, Mrs. Gates? A. Five. Q. All living? A. Yes. Q. All boys? A. Three boys, two girls. Q. Charles B. Gates, the bankrupt in this case, was the youngest boy? A. He was. Q. Did you educate or advance moneys to any of your other children? A. I did not. Q. Charles B. Gates was schooled and advanced money for traveling purposes? A. Yes, sir; with the intention of giving it back. Q. And the other children never got such money? A. No."

The bankrupt seems to have been the principal if not sole recipient of his mother's bounty. She states that while she educated and ad-

vanced money to the bankrupt for traveling and other expenses, she did not educate or advance money to any of her other children. All of the children lived with her in their family home save that possibly one of her sons was absent for a while, and there is no suggestion of any difficulty or friction between the defendant and any of the children. Nothing appears either by any statement on her part or from any other source to explain what, in the absence of a desire on her part to protect her son against creditors, would have been, had it occurred, an unnatural piece of favoritism towards the bankrupt. The story told by the defendant on the subject of consideration is too unnatural and improbable for credence. The known rules regulating human conduct forbid its acceptance. On her own showing the bankrupt had received his education at Mercersburg Academy, Pierce's Business College, Wood's Business College and Wilkes-Barre Institute, if not at other institutions of learning, and according to her statement she was clear in her understanding and intention that all moneys passing from her to the bankrupt before as well as after he became of age and prior to the execution of the deed were not and should not be considered gifts to her son, but merely loans, to be repaid to her. Under these circumstances why should she not have taken receipts from him? And if they were taken, why were they not produced by her? She states that the $6,000 mentioned in the deed as consideration was paid to the bankrupt "part in orders and part in cash." Where are the orders? Why were they not produced and offered in evidence? The bankrupt although living with the defendant and present in court during the whole or larger portion of the trial was not called nor did he attempt to corroborate the defendant's story in any respect, nor did any other person.

Under the circumstances and in view of the relationship between the defendant and the bankrupt there is a prima facie presumption that whatever money may have been handed or paid to the bankrupt was by way of gift and not loan, and hence incapable of serving as consideration to support the deed.

The bankrupt attained his majority May 29, 1911, as before stated, and it appears not only from the documentary evidence, but from his testimony, and is not disputed, that he received June 16, 1911, from his guardian $4,753.62 in cash, being proceeds of sale of a portion of his interest in certain coal lands to the Delaware, Lackawanna & Western Railroad Company. This occurred only seven and a half months prior to the date borne by the deed in controversy. There is no evidence that during that period the bankrupt lost, squandered or otherwise disposed of the money thus received from his guardian. The evidence does not disclose what became of it. Yet the defendant testified in effect that during that period she gave money to the bankrupt "right along, he had no income of any kind only what I gave him or lent him"; that after he became of age and before the execution of the deed she "might have given him $2,000 or $3,000"; that in December, 1911, and again in January, 1912, she loaned him "$200.00 or $300.00"; that she loaned him those sums "because he took a trip and went to the city"; that he said he needed the money;

that he hadn't any money of his own that she knew of,—"not a cent"; that in letting him have this money she did not give him so much as $100 at a time, but "maybe $25.00, $50.00 or $10.00." That the defendant should for the purpose of enabling her son to take one trip to the city have loaned him in December and January from $400 to $600, or from $200 to $300, in various and scattered sums of $25, $50 and $10 she does not attempt to explain. But, aside from this inexplicable action on her part, the bankrupt, although knowing he had received from his guardian since coming of age the sum of $4,753.62, vouchsafed no explanation whatsoever of what had become of that sum, and did not attempt to corroborate the defendant in any particular with respect to her alleged loans to him. Knowing the facts he sat speechless in open court when, if the defendant had been testifying truly, considerations of honor, gratitude and affection should have compelled him, by his oath, to defend and uphold his mother. And the defendant necessarily knowing that her favored son knew of the fact of loans or no loans, omitted to call him as a witness on the vital point and presumably did not dare to take that step. Under the circumstances this failure to insist upon testimony from him amounts to a confession of fraud on her part.

Again, the defendant testified that prior to the execution of the deed in controversy she told the bankrupt, "I wanted my money back. I thought he ought to try and pay me in some way," and he said, "I have no money, but I will transfer my property to you." If this were a correct statement by the defendant of what was said by her and her son on that occasion can there be any reasonable question that he would not have corroborated her? But further, if her object was, as she states, to get her "money back," why not secure its repayment by a mortgage? That would have been the direct and straightforward course to pursue. She and the bankrupt fixed the amount of the consideration to be inserted in the deed at $6,000 on the estimated amount of "the money I loaned him." She does not suggest or intimate that the amount so alleged to have been fixed by estimate represented or was intended to represent the value of the property to be transferred to her by her son. If this sum of $6,000 was agreed upon as the amount of money loaned by her to him the question recurs, why not secure its payment by mortgage? If her real intention had been to secure the repayment of money loaned to the bankrupt that would have been the obvious and natural course to pursue. But she did not follow it, but on the contrary took a deed of conveyance stating a misleading and deceptive consideration. What possible explanation consistent with fair dealing can be given of this course? The defendant in her testimony admits that the deed contained an untrue statement of consideration, and that she does not know why the sum of $100 was mentioned, and avers that she thinks she told Hines, her lawyer, to insert $6,000 as the consideration, and that she does not know why it was changed from $6,000 to $100. In Moore v. Roe, 35 N. J. Eq. 90, which in some of its features was strikingly similar to the case now before this court, a transfer by a son to his mother of all

his property was set aside as having been executed in fraud of a creditor. The Vice Chancellor in delivering the opinion of the court said:

"When the conveyance was made, the true amount of William's indebtedness to his mother was not ascertained, as in a genuine bargain it would have been; nor was the price or value of the farm considered and settled, as it would have been if the transaction had been in reality what it purported to be. The indebtedness was arrived at in a proximate way. * * * The transaction cannot, I think, be reasonably taken to have been a bona fide sale and purchase. * * * If no intention had been entertained to hinder or delay the complainant, the mother's claim, if just, would naturally and properly have been secured by a mortgage giving her a prior lien on the land to the extent of her debt, and leaving the balance of the son's estate therein to be resorted to by his creditors. The course actually taken was a deceptive and embarrassing one, calculated to mislead and impede the creditor, who was known to both parties to the deed to be prosecuting his claim. It is not difficult for parties taking such a course to deny the existence of an intention to hinder, delay or defraud, and so far to persuade themselves that their only purpose was to secure a debt due the grantee, as to make their denial without willful perjury, but the unavoidable inferences from their acts will countervail their denial."

But the circumstantial evidence of fraud on the part of the bankrupt and the defendant does not stop here. The deed, although bearing date February 1, 1912, was not recorded until May 13 of the same year. The firm of Bryden & Gates began its existence, as before stated, February 29, 1912, after the expressed date but before the recording of the deed. By way of explanation of the discrepancy between its date and the time it was recorded the defendant testified that the bankrupt brought the deed in question to her home on the day on which it was drawn up and told her he would take it back and get it recorded, and that she said "No, I wish my son Abram to see it," and on the following morning gave it to him to read over. She then proceeded as follows:

"Q. Go on and tell the history of that deed? A. I gave it back to Charles and said, 'Take it right over to Mr. Hines and have it recorded,' which he didn't. Instead of taking it over, he laid it in his drawer and I thought it was recorded, I didn't know anything about it until Mr. Hines said one day, 'Mrs. Gates, that deed isn't recorded.' I said, 'It must be, I gave it to Charles;' he said, 'It isn't,' and when Charles came in I said, 'What did you do with that deed, Charles?' He said, 'I forgot it. It is up in my drawer,' and I said to him, 'Take it right over,' and he did. Q. How long was that? A. About in May, I think, the last of May, about the middle of May. Mr. Hines called my attention to it. He was up in the Court House looking after some of my business and discovered it. * * * Q. Then your son took the deed to Mr. Hines, did he? A. Yes, I scolded him when he came in. I said, 'You were very careless, Charles,' and he said, 'Well, I forgot it, Mother.' And I made him take it right away."

To say the least this is an improbable explanation. That after all her solicitude on the subject of securing the repayment of the money alleged to have been loaned by her to her son, she should not have sooner ascertained from him, living as he was with her, whether the deed had been recorded in accordance with her express request, is somewhat remarkable. There was no corroboration by Hines. In fact he died before the trial. There was not a word of corroboration from the bankrupt although he testified as to other matters during the trial, and knew the facts. She made no attempt to examine him in that

behalf. The bankrupt has nowhere stated that the deed was executed prior to May. Nor was there a word of corroboration from her son Abram to whom she states she gave the deed for his perusal on the day after she says she received it. Her failure to call him as a witness is wholly unaccounted for. Only one inference can be drawn from this circumstance, namely, that the deed had not then been executed and was not executed until sometime in May and several months after the business of Bryden & Gates had been launched. And the conclusion thus reached on this point is in accordance with the evidence, not only of the officer before whom the deed was acknowledged, but of several other witnesses. Bryden testifies in substance that he was first informed on a Saturday in May, 1912, by the bankrupt that he had transferred his property to his mother; that on that day he drove the bankrupt from the firm office of Bryden & Gates in Kingston across the river to Wilkes-Barre and went with him to the Savoy building in that city, where "he told me he wanted to see Hines, who he told me was his attorney at that time"; that the witness waited outside for a while and when the bankrupt came out "he pulled a paper out from his pocket at that time and showed it to me, telling me then that he had transferred the property to his mother, and I remarked then that he was a little bit late and he said, 'Oh, I guess not'"; that the witness told the bankrupt that "it was going to hurt our credit, and I thought it was pretty late any way and it could not do him any good and might do the firm a lot of harm"; that the bankrupt told the witness at the time he showed the paper that "it was an assignment of his property to his mother"; and that the bankrupt had before that time spoken of assigning his property to his mother, stating that "he had everything to lose and I had nothing." John T. Evans, engaged in the business of plumbing and heating, testified in substance that he did business with Bryden & Gates and that he met the bankrupt May 10, 1912, and gave him a statement of the witness's account against him; that "when I took this statement over he seemed to fly off again and he told me at that time that he was going to transfer his property, his real estate and all his belongings to his mother"; and that the bankrupt said "he had an experience with Brown and Timberman, I think the name is, the people he was in business with before, and he said that he didn't want to get in bad any more." Joseph Moore, a United States Commissioner, before whom the deed in question was acknowledged, testified in substance that he first saw the deed in question in the Savoy building; that the writing above the signature to the acknowledgment was not in his handwriting; that the acknowledgment had been filled out before the paper was brought in; that he "had no reason to suspect there was anything wrong with it"; that it was late in the spring of 1912 and pretty warm weather, and the witness was sitting at his desk in his shirt sleeves and, he thinks, with the window open; and that the acknowledgment, he thinks, was taken "in the very latter part of April or along in May, and I think it was on a Saturday." The bankrupt has not denied nor was he called upon by the defendant to deny the truth or accuracy of any portion of the testimony just referred to on the part of Bryden, Evans and Moore.

There are certain circumstantial facts in evidence in connection with an intervention by the bankrupt some ten months after the execution of the deed in question in a suit involving title to real estate in Luzerne County, to which that deed related, devised by his grandmother, Mary Gates, which, in my opinion, show that not only the bankrupt but the defendant as well recognized that the former had not by that deed parted with any interest he may have had in the property to which it related and that it was a mere pretense and cover employed to keep it from his creditors. It is in evidence, and is not disputed, that after the execution of the deed in question no reconveyance was ever made by the defendant, directly or indirectly, to the bankrupt of any portion of the property covered by it. The suit referred to was an action of assumpsit in the Court of Common Pleas for Luzerne County, in 1913, between Fred B. Davis and W. M. Vanhorn. Davis was a purchaser from a devisee under the will of Mary Gates. The devise was to Mary G. Myers for life and thereafter to her heirs, and should she die without leaving any children, with remainder over to her grandchildren; and the question of law involved was whether the devisee took a fee simple or only a life estate. If the devisee took the latter the remainder over would or might have enured to the benefit of the bankrupt and his brothers and sisters. If on the contrary the devisee took a fee simple the bankrupt and his brothers and sisters would take nothing so far as the particular lot of land in that suit. was concerned. Davis sued for the recovery of the unpaid balance of purchase money which Vanhorn had contracted to pay if the plaintiff tendered him a good title in fee; and the court having found that the fee was vested in the plaintiff entered judgment against Vanhorn March 17, 1913. On March 20, 1913, Hines as attorney for John W. Gates, Mary A. Gates, Abram N. Gates, Charles B. Gates (the bankrupt), and Myron Strickland, guardian of Emily J. Gates, presented a petition that they be allowed to intervene in the suit, stating under oath that he believed that they "are seized as devisees of an estate in fee simple in said house and lot * * * and the above named parties will be bound by the judgment of the court in said case stated, and now desire to be made parties," etc. Whereupon, the court granted them leave to intervene on the ground that "the said parties have rights which will be adjudged by the judgment entered in the above case." The bankrupt both personally and through Hines as his attorney took, but in vain, active steps on several occasions on behalf of himself and the other children of the defendant to set aside or reverse the judgment rendered for Davis. If the deed in question had been valid there would have been no interest left in the bankrupt, and there could have been no reason whatever on his part to intervene. His attitude and action in and toward that litigation amounted to the clearest recognition by him and Hines that the deed in question was a nullity or at least voidable. Now, during the whole period covered by the suit of Davis v. Vanhorn, Hines was attorney for the defendant. She states, "Mr. Hines has always been our attorney." There can be little or no doubt that the defendant knew of the attitude of the bankrupt in that suit and took a similar view of the deed in question.

If not as matter of law chargeable with the knowledge of Hines, her attorney, as to the position assumed by her son, her examination as a witness coupled with her omission to adduce available evidence to the contrary is sufficient to establish knowledge on her part of the position taken by the bankrupt. She testifies as follows:

"Q. Do you recall the time that there was some litigation about the interest which Mary Myers had in some real estate near your home? A. No. I can't tell the time. Q. Do you remember whether there was such litigation? A. Yes. * * * Q. Who was your counsel at the time of that litigation? A. Mr. Hines has always been our attorney. * * * Q. You remember that case went to the Supreme Court? A. Yes. Q. And Mr. Hines went down to Philadelphia with it? A. Yes, I think he did. Q. And your son Charles went down with him; didn't he? (Objected to.) Q. Who accompanied him? A. I could not say that. * * * Q. Now, I call your attention to the case of Fred W. Davis versus W. M. Vanhorn, in which case John W. Gates, Mary A. Gates, Abram N. Gates, Charles B. Gates and Myron Strickland, Guardian for Emily J. Gates, were interveners? A. I can't remember anything about it. Q. Do you recollect such a case? A. Well, it slips from my memory. Q. It involved the property next door to you, didn't it? A. I think it did. Q. Who was John W. Gates? A. That is my son. * * * Q. Who was Mary A. Gates? A. That is my daughter. Q. Who was Abram N. Gates? A. My son. Q. Who was Charles B. Gates? A. That is my son. Q. Who was Emily J. Gates? A. That is my daughter. * * * Q. Was there any conversation in your house relative to that law suit? A. No. * * * Q. Did you have any conversation at any time with any person concerning that law suit? A. I never remember that."

Here as on other points the story told by the defendant is so improbable as not to merit acceptance. That Hines while attorney for the defendant should have falsely or mistakenly asserted under oath that the bankrupt had an interest in the land, the title to which was in litigation, which if the deed in question was valid had passed to and was owned by her, or that he, notwithstanding his professional relationship to her, should have concealed from her the position assumed by her son in that suit with respect to the rights of property, which if the deed were valid were vested in her, is not readily to be believed. Nor is it to be credited that among the members of a united and harmonious family the action of the bankrupt and of the family attorney in behalf of all the children was not discussed or mentioned during the course of the suit. The defendant is not corroborated either by the bankrupt or by any of the other children. Not one of them was produced as a witness on the point and this omission is wholly unexplained. The defendant as well as the bankrupt must be held to have recognized the ineffectiveness of the deed and that it did not confer upon the former any valid title.

It appears from the testimony of Bryden, and is not denied either by the bankrupt or the defendant, that Bryden and the bankrupt had conferences with the defendant after the formation of the partnership and before the execution of the deed in question, touching the business and affairs of the former. And it also appears that the bankrupt had charge of the books of the firm, and Bryden of the outside work. No balance was ever struck on the books and they are mutilated and unintelligible.

Neither Bryden nor the bankrupt was able to extract from the books the slightest information as to the solvency or insolvency of the firm

or the condition of its business at any particular date; nor does the evidence clearly disclose just when the bankrupt or Bryden & Gates became insolvent. Nor is it material that the precise date of the occurrence of insolvency should be determined, or whether it happened before or only after the execution of the deed in question. It is sufficient that the bankrupt became insolvent prior to the bringing of this suit.

The evidence has fully satisfied me that the deed in question was executed, not February 1, 1912, but May 11, 1912; that it was fraudulently dated back of the formation of the partnership of Bryden & Gates in order to ante-date the existence of any firm indebtedness; that it was executed without any consideration moving from the defendant, and with intent to delay and defraud creditors of the bankrupt whether then or subsequently existing; and further, that the defendant was fully cognizant of and a party to this fraudulent scheme and contrivance.

[7] The defendant insists that the plaintiff failed to prove that the deed in question was "fraudulently made with the dishonest intent to defraud the then existing creditors of the said Charles B. Gates." But fraud meditated against subsequent creditors is of the same quality as that meditated against existing creditors, and if operating to defeat, hinder or delay subsequent creditors by covering and concealing from them property really belonging to the debtor, will receive equal condemnation and correction at the hands of a court of equity.

In Thomson v. Dougherty, 12 Serg. & R. (Pa.) 448, it was said that if a man "is not indebted and make a voluntary conveyance to a child, without particular evidence or badge of fraud to defeat subsequent creditors, that would be good; But if there be any mark of fraud, or intention to defeat subsequent creditors, that will make it void. * * * But the being indebted is not the only badge of fraud; the transaction may be chargeable with such circumstances, as will raise the presumption of fraud." In Harlan v. Maglaughlin, 90 Pa. 293, it was recognized that a voluntary conveyance will not stand as against subsequent creditors where it appears that the grantor intended to withdraw his property from the reach of such creditors. So in Horbach v. Hill, 112 U. S. 144, 149, 5 Sup. Ct. 81, 83 (28 L. Ed. 670), it was declared that "a voluntary conveyance is good as against subsequent creditors, unless executed as a cover for future schemes of fraud." And in Graham v. Railroad Co., 102 U. S. 148, 153, 26 L. Ed. 106, it was said by Mr. Justice Bradley that "it is true that if a debtor dispose of his property, with intent to defraud those to whom he expects to become immediately or soon indebted, this may be a fraud against them, which they may have a right to unravel." Nor will the payment by a fraudulent grantee of a valuable or sufficient consideration protect the conveyance as against creditors. In Jones v. Simpson, 116 U. S. 609, 614, 6 Sup. Ct. 538, 541 (29 L. Ed. 742), it was declared that the payment of a sufficient consideration by a vendee would protect him, however fraudulent the intent of the vendor, "unless it appears affirmatively, from all the circumstances, that he pur-

chased in bad faith. And such bad faith may exist where the vendee purchases with knowledge of the fraudulent intent of the vendor, or under such circumstances as should put him on inquiry as to the object for which the vendor sells." In Blennerhassett v. Sherman, 105 U. S. 100, 117, 26 L. Ed. 1080, the court said:

"It is not enough, in order to support a settlement against creditors, that it be made for a valuable consideration. It must be also bona fide. If it be made with intent to hinder, delay, or defraud them, it is void as against them, although there may be in the strictest sense a valuable or even an adequate consideration."

May in his work on Fraudulent Conveyances, p. 67, says:

"Where the contrivance or fraudulent intention appears there is no need to shew that there were creditors existing at the time; it•is enough if any creditor, whether existing before or after the transaction, is or may be defeated."

[8] It is contended that the bankrupt had no title or interest in or to the lands and premises to which the deed in question relates, which could pass to his trustee in bankruptcy. After an examination of the wills of Mary Gates and John R. Gates, his grandparents, I do not think this position can be maintained. In the will of the former, dated October 4, 1889, the testatrix, who died April 27, 1890, provided, among other things, as follows:

"My residence that I now occupy, with all the things therein belonging, it is my wish and will, shall remain in possession of my husband, John R. Gates, during his lifetime. * * * After the death of my husband, John R. Gates, the property that I now occupy as my residence, I will and bequeath the same to my son, Frank, for his use during his lifetime. And the property adjoining on the southwesterly side of my residence, after the death of my husband, John R. Gates, I will and bequeath the same to my son, William R. Gates, for his use during his lifetime, and after the death of my sons, Frank and William, said properties to go to my grandchildren, their heirs and assigns forever."

John R. Gates, who died June 6, 1894, in and by his will dated March 21, 1889, provided, among other things, as follows:

"Fifth. I give, devise and bequeath unto my wife, Mary Gates, and my two sons, William R. and Frank R. Gates, share and share alike, during their natural lives, the use of the rent or royalty to be divided [derived?] from the five tenements with the lots attached I own on Plymouth Road in Kingston Borough, the house and lot on Careytown Road, and the rental coming from the Delaware, Lackawanna and Western Railroad Company on account of my lease of the coal under or upon a piece of land on the flats in Plymouth Township; said buildings to be kept in repair out of the rentals therefrom and all taxes, repairs, and insurance on said real estate to be paid out of the receipts therefrom before any division is made of the proceeds thereof. After the decease of my said wife, said rents and coal royalties shall be divided equally between my said sons William R. and Frank R., subject to above payments, during their natural lives. After the decease of either of my said sons, his share of said rents and royalties shall be paid to my grandchildren, share and share alike, subject to above payments, during the natural life of the survivors [survivor?] of my said sons. Sixth. I give, devise and bequeath unto my wife, Mary Gates, one third the net income, after taxes and all charges are paid, of the surface during her natural life, of the piece of land containing about fifteen (15) acres which I own on the flats in Plymouth Township, and the piece of land on the flats in Kingston Township, containing about nineteen (19) acres. Seventh. Subject to my wife's rights therein I give, devise and bequeath unto my son, William R. Gates, the use

during his natural life of the surface of the piece of land which I own on the flats in Plymouth Township, containing about fifteen (15) acres, he to pay all charges and taxes against the same. Eighth. Subject to my wife's rights therein, I give, devise and bequeath unto my son, Frank R. Gates, the use during his natural life of the surface of the piece of land which I now own on the flats in Kingstown Township containing about nineteen (19) acres, he to pay all taxes and charges against the same. * * * Tenth. Subject to the life interest heretofore given, I give, devise and bequeath unto my grandchildren, not only those now born, but who shall be hereafter born, their heirs or assigns, share and share alike, the following real estate: First, the five tenements, with lots attached, on Plymouth Road in Kingston Borough. Second, the house and lot on the Careytown Road in Wilkes-Barre, but with no right to the coal thereunder, it having been heretofore devised to my wife and sons. Third, the surface of the tract of about fifteen (15) acres of land on the flats in Plymouth Township. Fourth, the surface of the tract of about nineteen (19) acres of land on the flats in Kingstown Township, said above devised lands and tenements to be equally divided among my grandchildren living at the death of my two sons or the survivor of them."

William R. Gates, son of the testator, died before the execution of the deed in question, but Frank R. Gates, his other son, is still living. Under the will of his grandmother it is clear that the bankrupt took a vested interest which, so far as not validly aliened, passed to his trustee in bankruptcy. And under the will of his grandfather I think he took an interest, subject to be defeated by the happening of the contingency of his dying before the death of the survivor of his uncle William R. Gates and his father Frank R. Gates. The gift to the bankrupt of the interest or estate does not consist in the direction for an equal division among his grandchildren living at the death of the survivor of the two sons of the testator, but on the devise of the real estate "unto my grandchildren, not only those now born, but who shall be hereafter born, their heirs or assigns." The contingency here relates, not to the person, for the bankrupt was on the death of the testator ascertained as one of the grandchildren and belonging to the class of persons who were to take, but to the event, the happening of which would defeat the gift already made. In the case of In re Twaddell, 110 Fed. 145, I had occasion to examine with much care the subject of the vesting of contingent interests in trustees in bank-ruptcy, and I am satisfied that under the Pennsylvania decisions and for the reasons given in that case, which related to Pennsylvania real estate, the contention now made by the defendant is without merit.

Much evidence has been adduced by each of the parties touching the value of the lands and premises of which the deed in question covered the bankrupt's share, in order to determine the value of that share. It is unnecessary, I think, to discuss or consider that evidence in this suit, as the plaintiff on an amendment of the bill properly charging fraud as against the defendant will be entitled to a reconveyance from her to him of that share or so much as has not been disposed of by her, whatever may be its value.

The evidence shows that in the summer of 1913 a portion of the Gates estate in Luzerne County was sold and conveyed to the Wilkes-Barre Connecting Railway Company for $60,000; and that in the adjustment of the shares as between the defendant and her children it was agreed that the life interest of the former should be treated as

of the same value as the share of one of her children. The $60,000 being divided into equal parts, each child other than the bankrupt received $10,000 and the defendant received the remaining $20,000, of which $10,000 represented her own share as agreed upon, and $10,000 the proportionate share of the bankrupt claimed by her under the conveyance in question. The conveyance having been fraudulent as against the bankrupt's creditors, the plaintiff will on properly amending the bill as above stated be entitled to recover from the defendant in addition to such of the real estate covered by the deed in question as remains undisposed of, the sum of $10,000, together with legal interest thereon from the first day of August, 1913, the date of the conveyance to the Wilkes-Barre Connecting Railway Company, until the same be paid.

Leave is hereby granted to the plaintiff to amend his bill within thirty days from the date of this opinion so as properly to charge fraud against the defendant in accordance with the evidence, and upon the submission to this court and filing of such amendment a decree for the plaintiff in accordance with this opinion may be prepared and submitted.