### GAMBLE v. BROWN et al. *

Circuit Court of Appeals, Fourth Circuit.
November 15, 1928.

No. 2720.

*Certiorari denied 49 S. Ct. 253, 73 L. Ed. ——.

Connor Hall, of Huntington, W. Va. (D. C. T. Davis, Jr., of Charleston, W. Va., on the brief), for appellant and cross-appellee.

W. E. Haymond and Van B. Hall, both of Sutton, W. Va. (Haymond & Fox, of Sutton, W. Va., on the brief), for appellees and cross-appellants.

Before WADDILL and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. On August 26, 1914, the first National Bank of Sutton, W. Va., closed its doors. It was found to be insolvent by the Comptroller of the Currency, who appointed a receiver to wind up its affairs and enforce the personal liability of its stockholders. It was discovered that the condition of the bank was due in large measure to acts of embezzlement and fraud committed by Homer H. Dean, the vice president, and to excessive and unwarranted loans made to him, to members of his family, and to a corporation of which he was the principal owner. He also owned or controlled a majority of the capital stock of the bank, which amounted to $50,000.

It transpired that the directors of the bank had taken little or no interest in its affairs, but had left its management almost exclusively to Dean himself. Accordingly, a bill of complaint was filed by the receiver on March 8, 1917, against the directors in office when the bank closed, and certain other defendants who had been directors in former years, charging that the bank's failure was due to their neglect. Answers de-

nying liability were filed by most, if not all, of the defendants, except H. H. Dean himself, who had absconded. The case was referred by the District Judge to a special master, who took a great mass of testimony, which shows quite clearly that the directors were so negligent that it was easily possible for Dean to accomplish his unlawful designs without detection.

The evidence will be later dealt with in detail; but it may be said at this point that the directors were negligent in the following respects: (1) They failed to hold or attend monthly meetings of the board, as prescribed by the by-laws of the bank. (2) They failed to cause the affairs of the bank to be periodically examined and audited by a committee appointed by them under the by-laws. (3) They failed to cause the loans discounted by the bank to be passed upon by a discount committee, as required by the by-laws, and failed to pass upon the loans as a board. (4) They failed to require of H. H. Dean a bond for the faithful performance by him of his duties as vice president of the bank.

The special master filed a carefully prepared opinion to the effect that the losses sustained by the bank were directly caused by the failure upon the part of the directors to exercise proper care and prudence in the management of its affairs. In respect to attendance upon meetings of the board, he said:

"It plainly appears from the testimony that in the matter of holding meetings the directors were grossly negligent, and that notwithstanding the frequent admonition of the bank examiner, they failed and neglected to perform their duty in this respect. * * * Regular monthly meetings were prescribed by section 12 of the by-laws, which further provided that upon failure of a quorum to attend, there should be an adjournment from day to day until a quorum could be had. The directorate consisted of nine directors. At only one time during the period from January 10, 1911, to August 26, 1914, when the bank was closed, was there in attendance at a meeting more than six directors, and at that time the number present was seven. And at 18 of the 28 meetings held only a bare quorum was present. And of those meetings five were held in August, 1914, when the bank's affairs had reached a crisis terminating in its suspension, and too late to remedy conditions resulting from inattention to its affairs."

There were only two meetings of the board between January, 1914, when Dean took charge of the bank, and August, 1914, when his defaults were discovered. They were held in May and June, respectively. At neither was there a report of the loans made or business done by the bank, or an account of its assets and liabilities submitted.

The master found that the losses chargeable to the directors, with interest to December 1, 1921, amounted to the sum of $65,619.17. Three of the directors having made settlement in the aggregate sum of $11,850, the master recommended that a decree be passed, adjudging that certain of the directors were liable to the bank for the balance of $53,769.17. Exceptions were filed to the master's report in December, 1921, by the receiver, and by certain of the directors. The final decree of the District Court was rendered on November 26, 1927. It was not accompanied by an opinion.

Numerous items in which the master had found that the bank had suffered losses through the negligence of the directors were disregarded; but it was decreed that certain directors of the bank were liable to the extent of $10,000 for negligence in failing to require a fidelity bond from the vice president, and that there should be credited against this amount one-sixth of $10,600 paid by two directors in settlement of their liability, leaving a principal liability of $8,233, to which was added interest from the date of the institution of the suit until November 1, 1927, making a total of $13,402.82. The costs of the suit were divided equally between the receiver and said directors.

There is little difficulty in this case as to the proper rules of law to be applied. The directors are charged in the first place with the violation of certain statutory duties imposed upon them by acts of Congress. It is alleged (1) that they failed to observe the provisions of R. S. § 5200, as amended (12 USCA § 84), which provides that the total liabilities to a national bank of any person for money borrowed shall at no time exceed one-tenth part of the amount of the capital stock and surplus of the bank; and (2) that they failed to observe the provisions of R. S. §§ 5136, 5137 (12 USCA §§ 24, 29), in so far as they forbid a national bank to hold the possession of any real estate under mortgage. In addition to violation of statutory duties, it is also charged that the directors failed to perform their common-law duty to diligently administer the affairs of the bank. Indeed the greater part of the case is concerned with the failure of the directors to perform their duties as prescribed

by the common law rather than duties imposed by statute.

■■ The law applicable to this situation is clearly set out in Bowerman v. Hamner, 250 U. S. 504, 39 S. Ct. 549, 63 L. Ed. 1113, in which the Supreme Court held that in a suit against bank directors, based solely upon a violation of duty imposed by the National Bank Act (12 USCA § 21 et seq.), it is not enough to show a negligent violation of the act, but in effect an intentional violation must be shown in order to justify a recovery. At the same time, it was explained, the act does not relieve the directors from the common-law duty to be honest and diligent, and the degree of care required in this respect is that which ordinarily prudent men would exercise under similar circumstances. The court said (250 U. S. 513 [39 S. Ct. 552]): 。

"That ordinarily prudent and diligent men, accepting election to membership in a bank directorate, would not willfully absent themselves from directors' meetings for years together as Bowerman did cannot be doubted; that a director who never makes, or causes to be made, any examination whatever of the books or papers of the bank, to determine its condition and the way in which it is being conducted, does not exercise ordinary care and prudence in the management of the affairs of the bank is equally clear; and that Bowerman, when guilty of neglect in both of these respects, did not exercise the diligence which prudent men would usually exercise in ascertaining the condition of the business of the bank or a reasonable control and supervision over its affairs and officers is likewise beyond discussion. He cannot be shielded from liability because of want of knowledge of wrongdoing on his part, since that ignorance was the result of gross inattention in the discharge of his voluntarily assumed and sworn duty."

With these principles in mind, it is necessary to examine in detail the various specifications of loss for which the receiver seeks to recover. Certain of the items which entered into the total amount found by the master against the directors have been abandoned by the receiver on this appeal, and we shall limit the inquiry to the items which remain.

For most purposes, the period under investigation begins on January 15, 1914, and ends on August 26, 1914. On the first date, the First National Bank of Sutton, W. Va., entered into an agreement with the Farmers' Bank & Trust Company of the same place, whereby the bank took over the business of the trust company and agreed to assume its liabilities in the amount of $203,970.32. In consideration thereof, the bank received, amongst other assets, certain notes payable to the trust company, aggregating $169,619.71, a list of which was made up and was intended to be annexed to the agreement. The transaction was an important one, outside the ordinary routine of banking business. Moreover, in a sense Dean was on both sides of the transfer. On the one hand, he had acquired control of the stock of the bank, and had been chosen to manage its affairs; and, on the other, he was an interested party, because he had been the treasurer and active officer of the trust company, which was then about to retire from business. It needs no argument to show that, under these circumstances, the dictates of ordinary care required a careful examination of the assets which were offered to the bank as consideration for its assumption of substantial liabilities. The fact is too much reliance was placed upon Dean's integrity. It may be added, in order that the situation during the next succeeding eight months may be understood, that Dean remained in control of the institution from January 15, 1914, until August 24, 1914, when he was removed from his position of vice president and director of the bank. Shortly before this action, he had confessed to a great many irregularities and had absconded. He was subsequently adjudicated a bankrupt.

### The Note Shortage.

One of the chief sources of loss to the bank was a shortage in the notes transferred by the trust company. When the directors met on August 24, 1924, after Dean's irregularities had been discovered, they ordered that a shortage in these notes, amounting to $16,936.21, should be charged to the profit and loss account. The master found that the actual amount of shortage was $15,250. For reasons which it is not necessary to state, the receiver, however, limits his claim in this respect to $14,250. The notes which make up this amount are as follows:

| | |
|---|---:|
| B. H. Rawson | $2,500 00 |
| B. H. Rawson | 2,000 00 |
| Homer H. Dean | 1,850 00 |
| Homer H. Dean | 1,800 00 |
| Homer H. Dean | 200 00 |
| Homer H. Dean | 400 00 |
| H. M. Bourn | 1,000 00 |
| H. M. Bourn | 1,000 00 |
| Oak Run Lumber Company | 2,500 00 |
| John I. Bender | 1,000 00 |

We find, under the evidence, that there was such a shortage. Indeed, it is conceded

that it existed and that Dean was responsible for it. On January 15, 1914, notes were exhibited to the assembled directors, who passed upon them to ascertain whether or not they were acceptable. H. H. Dean, O. O. Sutton, and A. M. Berry were appointed a committee of directors to examine the notes and other assets to be transferred. The notes were left in Dean's custody. It was understood that copies of the list of notes were to be made and attached to copies of the agreement, to be held by the contracting parties, and that a subsequent meeting of the board would be shortly held in order to perfect the details of the settlement. This meeting, however, was never held, and the list of notes was never attached to the agreement. What purported to be a copy of it was subsequently found by accident, after the failure of the bank, in the vaults of the trust company by the receiver thereof. The result was that there was no record in the bank, which showed in detail the particular notes which were transferred. The contract and the books of the bank merely specified the aggregate amount.

The parties disagree as to whether the notes were ever delivered to the bank, or whether, on the other hand, they were abstracted after delivery by Dean for his own evil purposes. The defendants contend that the list of notes was carefully checked at the time of the transfer, and that it was easy for Dean to destroy the list, make another to suit himself, and embezzle the proceeds of the purloined notes as they were paid, substituting other old and worthless notes of the trust company in his custody to conceal the shortage. The directors, it is urged, should not be held responsible for the unforeseen fraudulent acts of a trusted executive. Dresser v. Bates, 251 U. S. 524, 40 S. Ct. 247, 64 L. Ed. 388. There is evidence to support the defendants' theory. Nevertheless it clearly appears that the negligent acts or omissions of the directors made it easy for Dean to abstract notes. They failed to exercise ordinary business caution when they intrusted the custody of the transferred assets to an unbonded officer, himself personally interested in the items transferred. It was careless on their part not to hold a meeting subsequent to January 15, as they had determined, in order to ascertain whether the details of the transfer had been properly accomplished.

More important was the failure on the part of the directors to appoint a committee to examine or audit the affairs of the bank. Section 20 of the by-laws of the bank provided that the board of directors should appoint a committee of three members to exercise a supervision of the business, and to examine every three months the affairs of the bank, count the cash, and compare its assets and liabilities with the accounts of the general ledger, and to report the result of their examination in writing to the board at its next regular meeting. As a matter of fact, no audit of the bank was made from January to August, 1914. On June 10, 1914, an auditing committee of O. O. Sutton, A. M. Berry, and H. H. Dean was appointed to audit the bank, but there is no evidence of any activity or report on its behalf. On August 7, 1914, four of the directors, including H. H. Dean, T. G. Dean, O. O. Sutton, and Philip S. Perkins, addressed a letter to the Comptroller of the Currency, upon the suggestion of the national bank examiner, in which, amongst other things, they promised to have an examining committee make an examination of the bank within the next 30 days, but by that time the harm had been done.

It is contended by the defendants, however, that, even if the examining committee had functioned, it could not have discovered the embezzlement of the notes by Dean. It is pointed out that K. B. Cecil, a bank examiner and expert accountant, made examinations of the bank in 1914 and failed to discover the shortage until his third visit. The bank examiner made three examinations —on February 10, August 7, and August 22, respectively. The shortage of notes was discovered as the result of the examination of August 7. Certain notes, which should have formed part of the assets of the bank, were represented by memoranda indicating that they were in the hands of other banks for collection. Between August 7 and August 22, the examiner communicated with these banks and discovered that notes aggregating approximately $17,000, which were supposed to be in their hands, were not so held. Hence he returned on August 22 and closed the bank. A similar check was made by the examiner on February 10, but no shortage was discovered. But it was possible for Dean at that time to have substituted in the note case, without detection, other worthless notes of the Farmers' Loan & Trust Company which he then had on hand. Such a substitution, however, could not have been made later on, when the notes would have matured. An auditing committee of the bank in the ordinary course would have checked the memoranda of notes in other banks for collection, precisely as did the ex-

aminer. The directors were culpable in this respect, and are liable to the bank for the losses which their neglect made possible. We think that the following comment of the special master was justified by the evidence:

"It cannot be urged that the fraud alleged to have been committed by H. H. Dean was so ingeniously devised and concealed that same would have escaped detection, had the directors been more vigilant, or had proper audits been made of the bank's affairs. The proof shows that the directors were not vigilant, or even careful, and that audits were not made. Had the directors prudently and carefully performed their duties, it is fair to presume either that Dean would not have attempted his dishonest practices, or that they would have been detected. The directors' indifference opened the way and Dean stepped into it."

The following directors were elected on January 13, 1914: A. M. Berry, I. C. Bishop, P. S. Perkins, Ed. L. Boggs, C. E. Mollohan, J. D. Sutton, I. N. Brown, O. O. Sutton, and H. H. Dean. The special master found that all of them were liable for the note shortage, except I. C. Bishop, and P. S. Perkins, who then became directors for the first time. It was conceded by the receiver below that, since Bishop and Perkins had no previous banking experience, they should not be held to the same degree of accountability as their older and more experienced associates. Nor does the receiver press this claim against Perkins and Bishop in this court. It does not appear from the record that Dean was reached by the process of the District Court. E. L. Boggs, A. M. Berry, and C. E. Mollohan paid $10,000, $600, and $1,250, respectively, in compromise of all claims of the receiver against them, and in consideration of a covenant on his part not to sue them. There remain only O. O. Sutton, J. D. Sutton, and I. N. Brown, whose liability for the loss arising from the note shortage must now be considered.

■ O. O. Sutton first became a director on January 13, 1914, but he had had experience both as a lawyer and a bank director. He was also a member of the committee appointed by the board of directors of the bank to take charge of the details of the transfer. He was a member of the discount committee of the bank, hereinafter referred to. He had been a director of the Farmers' Bank & Trust Company from 1912 to 1914. He was in the bank several times every week, and attended meetings of the discount committee or of the board, but usually there was not a quorum. He was undoubtedly negligent, as specified, in common with the other members of the board, and is liable on this charge.

■ J. D. Sutton is the father of O. O. Sutton. He had been a director of the bank since the year 1910, and was re-elected on January 13, 1914. His defense is that he declined to qualify as a director, and did not serve as such in the year 1914. He testified, without contradiction, that he told the board of directors that he would not serve, because Dean had too much control. R. S. § 5145 (12 USCA § 71), provides that bank directors shall hold office for one year and until their successors are elected and have qualified. No successor was elected to J. D. Sutton until May 2, 1914.

The plaintiff contends that J. D. Sutton is liable for all losses made possible by the negligence of the directors which occurred prior to the election of his successor, even though he may have resigned in the meantime. But it was held in Briggs v. Spaulding, 141 U. S. 152, 154, 11 S. Ct. 924, 35 L. Ed. 662, that R. S. § 5145, does not prohibit resignations during the year, and that a resignation orally tendered to the president of a bank and accepted by him, is effective. In Bowerman v. Hamner, 250 U. S. 514, 39 S. Ct. 549, 63 L. Ed. 1113, a similar defense was overruled for lack of evidence, and it was held that the director of a national bank remains responsible as such, in the absence of evidence that he has resigned or refused to qualify when re-elected.

In the case at bar there is testimony on the point, in addition to that of J. D. Sutton himself. A. M. Berry, president of the bank, who, having settled with the receiver, was called as a witness by him, testified that J. D. Sutton, although elected on January 13, 1914, did not qualify. O. O. Sutton, a witness for the defendant, testified that his father was not a member of the board in 1914. After January 15, 1914, there was no meeting of the board of directors at which a vacancy in the office of director could be filled until May 2, 1914, on which day a successor to J. D. Sutton was elected, in response to a demand by the Comptroller of the Currency. The matter is not entirely free from doubt, because the resignation was not in writing, which would have been the more regular and proper method of procedure. Nevertheless it is clear that J. D. Sutton took no part whatever in the activities of the board during the year 1914, and that members thereof, including the president, had knowledge of his unwillingness to

serve. We think that under these circumstances he should not be held for losses incurred by the bank through the negligence of the directors in 1914. It may be added that J. D. Sutton was not held liable by the decree of the District Court.

■ I. N. Brown was a director of the bank from 1911 to 1914, inclusive. Suit was brought on March 8, 1917. Brown's answer was filed April 11, 1917, and the case was referred to the master on November 19, 1918. Brown died on August 23, 1919, at the age of 79. His administrator was then made a party to the suit and filed an answer to the bill. The special master found Brown liable on all counts, and the District Court also held him liable to the extent of the decree. A special defense has been interposed on his behalf on the ground that, by reason of his age, his increasing bodily and mental infirmities, his illiteracy, and the distance of his home from the bank, he should be excused.

The master discussed the evidence in detail and concluded that Brown was a man of considerable business ability, who had accumulated a substantial estate as a farmer, money lender, and dealer in land and oil and gas leases. His activities in business continued as late as the year 1918. In 1913 he was a member of the discount committee, and on January 15, 1914, was elected second vice president. However, he completely failed to take any part in the affairs of the bank in 1914, either as a director or officer, until summoned to attend the meetings in August, 1914, at the instance of the bank examiner, after the harm was done.

It appears, however, that in 1914 he had some suspicion of H. H. Dean, and thought that an audit of the bank should be made. On or about May 1, 1914, he told A. M. Berry, the president of the bank, that he was too infirm to be a director, but would like to attend a meeting of the board to get a resolution through for an audit of the bank every 90 days. Nevertheless he did nothing. We agree with the master that the case against him is made out. Assuming that in 1914 the infirmities of advancing age made it inconvenient or difficult for him to perform the duties of a director, he nevertheless voluntarily remained in office, and thereby retained his responsibility to the corporation. See Briggs v. Spaulding, 141 U. S. 132, 11 S. Ct. 924, 35 L. Ed. 662; Bowerman v. Hamner, 250 U. S. 504, 39 S. Ct. 549, 63 L. Ed. 1113.

The conclusion is that O. O. Sutton and the estate of I. N. Brown are indebted to the receiver on this item in the sum of $14,250. The interest to be added, and the credits to be given by reason of the amounts paid in settlement by certain of the directors, will be hereinafter discussed.

### Excessive Loans.

Substantial losses were suffered by the bank through credit improvidently extended, either to H. H. Dean himself, or to members of his family, or to a corporation in which he was interested. These loans would not and could not have been made, had the directors exercised ordinary care in the management of the bank. Some of them were represented by notes transferred by the trust company to the bank on January 15, 1914, which were passed upon by members of the board, sitting as a body. Other notes were discounted by the bank in the ordinary course of business, subsequent to the transfer of the trust company's assets. It is important to consider, in connection with all of these notes, the provisions of section 13 of the by-laws of the bank. It provided that there should be a discount committee, consisting of the president, cashier, and three directors, appointed by the board every 12 months, with power to discount and purchase bills, notes, and other evidences of debt, and to report at each regular meeting of the board all such paper discounted by them. Section 23 of the by-laws provided that no officer or employee of the bank should be allowed to use the funds of the bank on his own account, either by loan or otherwise, without the consent of the board or its discount committee. The minutes of the board show that meetings of the discount committee were held on May 10, 1911, January 23, 1912, and February 20, 1912, and what was done by the committee on the dates mentioned. There is no other record of any meeting of the committee.

Moreover, there is positive evidence that the discount committee did not function in 1914. It is true that on January 13, 1914, A. M. Berry, O. O. Sutton, and H. H. Dean were elected members of the committee. On that date A. M. Berry was president and H. H. Dean was cashier of the bank. Consequently the committee, so appointed, did not conform with the provisions of the by-laws. On January 15, 1914, Dean became vice president and another cashier of the bank; but the irregular discount committee was not changed. It met from time to time at the banking room to consider notes that were presented for renewal and for discount. But the evidence indicates that Dean had gen-

eral charge of discounts, and did not always consult even the informal committee. The board of directors, as such, was never consulted and received no reports. It is not surprising, under these circumstances, that improper discounts were allowed and excessive loans were made. The board of directors took action on August 25, 1914, which substantiates the finding of the master that excessive loans were granted. The board ordered that there be charged to profit and loss the sum of $17,042.50, composed for the most part of items received from the trust company on January 15, 1914, or notes subsequently discounted. A number of the items to be now discussed were included in this total.

As early as February, 1914, the bank examiner became suspicious, because in his opinion the Deans were borrowing undue amounts. The same suspicion would have entered the minds of the board of directors, when they took over some of this paper on January 15, 1914, from the Farmers' Bank & Trust Company, had they considered the matter with ordinary care. The persons concerned were Homer H. Dean, his two brothers, Thomas G. Dean and Ernest Dean, his father, T. M. Dean, the White Oak Stave Company, and B. H. Rawson. The matter was called to the attention of the board by the bank examiner, and on February 10, 1914, a letter was written by the board to the Comptroller of the Currency, promising that certain excessive loans should be reduced within 30 days to the limit prescribed by the law. At no time in 1914 did the combined capital and surplus of the bank exceed $57,000. Hence no loan in excess of $5,700 could lawfully be made. Amongst the loans listed in the letter were the White Oak Stave Company, $8,000; H. H. Dean, $6,900; B. H. Rawson, $6,017.32. As a matter of fact, the loans to these persons were not reduced, but increased. When the matter came up for examination in August, the excessive loans included the White Oak Stave Company, $12,967.05; H. H. Dean, $10,441.80; Thomas G. Dean, $5,495.30; O. O. Sutton, $5,828.80; B. H. Rawson, $8,600.

The White Oak Stave Company was a corporation engaged in timber operations. B. H. Rawson was the manager, whilst Dean attended to the finances and seems to have been the chief owner of the business. Neither it nor any of the borrowers named was of sufficient financial responsibility to justify the loans made. All of the notes (except those abstracted by H. H. Dean) were kept in the bank, and would have been discovered by an auditing committee, even though they had been passed by a discount committee.

Considering the dual position which Dean occupied, as treasurer of the trust company and vice president of the bank, when the business of the trust company was taken over on January 15, 1914, ordinary business caution would have suggested to the directors the most careful scrutiny of the notes of the Deans, of the White Oak Stave Company, and of Rawson, which were included in the transferred assets. Similar caution should have been used in regard to new paper of these parties presented for discount during the subsequent months of 1914. Had the directors been diligent in this respect, we think that with one exception the notes we now examine would not have been accepted by the bank, and the losses thereon would not have been incurred. The following is the list of notes, and the losses thereon, for which the master held the directors to be liable:

| Number of Note. | Maker. | Indorser. | Date. | Amount. | Loss. |
|---|---|---|---|---|---|
| 1636 | T. G. Dean | H. H. Dean and collateral | Jan. 15, 1914 | $4080.00 | $1004.28 |
| 1635 | G. E. Dean | Collateral notes of H. H. Dean | Jan. 15, 1914 | 4591.80 | 3107.32 |
| 2083 | T. G. Dean | H. H. Dean | Jan. 15, 1914 | 1040.00 | 1040.00 |
| 1991 | White Oak Stave Company | T. M. Dean | Jan. 15, 1914 | 5000.00 | 3458.00 |
| 1255 | T. M. Dean | H. H. Dean | May 15, 1914 | 1000.00 | 1000.00 |
| 2059 | B. H. Rawson | White Oak Stave Company | July 24, 1914 | 2040.00 | 2040.00 |
| 2060 | B. H. Rawson | White Oak Stave Company | Aug. 6, 1914 | 2040.00 | 2040.00 |
| 1641 | B. H. Rawson | White Oak Stave Company | June 25, 1914 | 2500.00 | 2008.83 |
| 1755 | B. H. Rawson | White Oak Stave Company | July 8, 1914 | 2550.00 | 2550.00 |

The first four notes in this list were taken over by the bank from the trust company on January 15, 1914. The first to be considered is note 1636 for $4,080, payable by T. G. Dean to the trust company, and indorsed by H. H. Dean. It was secured by another promissory note for $4,000, dated January 14, 1914, and payable 12 months after date, by T. M. Dean and H. H. Dean to T. G. Dean. The last-mentioned note was

secured by a deed of trust of even date, made by T. M. Dean and S. J. Dean, his wife, together with H. H. Dean and Nellie Dean, his wife, conveying some 93 acres of land near the town of Sutton, in Braxton county, West Virginia.

██ After the failure of the bank, the mortgage or deed of trust was foreclosed. The real estate produced only $3,075.72, so that, the indorsers being unable to pay the loan, there was a loss of $1,004.28. The uncontradicted testimony, however, indicates that in January, 1914, it was reasonable to believe that the property was sufficient security for the loan. The master nevertheless decided that the defendants were liable on this item, for the reason that in his opinion they had violated the National Banking Act in two particulars: (1) Because the loan was excessive, since H. H. Dean was then liable to the bank for an amount in excess of 10 per cent. of the capital and surplus of the bank; and (2) because the security for the loan was real estate.

R. S. § 5200, provides that the total liabilities of any person to a national bank shall not exceed one-tenth of its capital stock and surplus. The master apparently assumed that, in determining the total liabilities of a person within the meaning of the section, his liability as a surety or indorser for money borrowed by others should be added to his direct liability for money borrowed by himself. But the contrary conclusion was reached by the Supreme Court in Corsicana National Bank v. Johnson, 251 U. S. 68, 83, 40 S. Ct. 82, 64 L. Ed. 141, which held that, whatever view it might entertain were the matter res nova, it was constrained by the long-continued practice of the Comptroller of the Currency to hold that liabilities incurred by one person avowedly and in fact as surety or indorser for money borrowed by another should not be included in the computation. Nor do we think, in view of the decision of the Supreme Court in Union Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188, that the taking of the note secured by deed of trust as security for the loan was a violation of R. S. §§ 5136 and 5137. It was held in that case that a similar transaction did not violate either the letter or the meaning of the prohibitions involved in those sections. See, also, National Bank v. Whitney, 103 U. S. 99, 26 L. Ed. 443; Fortier v. New Orleans National Bank, 112 U. S. 439, 5 S. Ct. 234, 28 L. Ed. 764.

We are therefore of the opinion that it was neither negligent nor illegal on the part of the directors to take this loan and that the loss incurred should not be charged against them.

Note 1635, for $4,591.80, is a note of G. E. Dean. It was secured by two notes, of $2,000 and $2,275, respectively, made by H. H. Dean, payable to the Farmers' Loan & Trust Company, which in turn were secured by deed of trust of September 30, 1912, executed by H. H. Dean and wife upon some 12 parcels of real estate in Braxton county, West Virginia. So far as the First National Bank is concerned, the transaction dates from January 15, 1914, when the two notes of Homer H. Dean, payable to the trust company and secured as aforesaid, were transferred by the trust company to the bank. They were renewed on January 31, 1914, and finally note 1635 was given as a subsequent renewal by G. E. Dean on May 31, 1914. It thus appears that on January 15, 1914, when the loan first came into the bank, it stood in the name of H. H. Dean, and was his loan. The evidence justifies the conclusion that the renewal in the name of G. E. Dean was merely a nominal change, and that the money was due and owing by H. H. Dean.

██ There is evidence tending to show that, when the loan was originally made by the trust company and was taken over by the bank, the land was worth in excess of the amount of the loan. As a matter of fact, when the deed of trust was foreclosed, the real estate sold for $1,484.58, and there was a loss to the bank in the principal sum of the loan of $3,107.22. We think that this loan was not made in violation of R. S. §§ 5136 and 5137, but that the directors are liable for the loss incurred on the ground that it was an excessive loan to H. H. Dean, within the prohibition of R. S. § 5200. The notes of H. H. Dean, transferred to the trust company on January 15, 1914, which were abstracted and formed a part of the note shortage discussed above, amounted to $4,250. Taking this sum into consideration, it is clear that the loan for which note 1635 was a renewal was in excess of one-tenth of the capital and surplus of the bank. The directors participating therein are responsible for such loss as was caused thereby, under R. S. § 5239 (12 USCA § 93), irrespective of the supposed value of the security. Corsicana National Bank v. Johnson, 251 U. S. 68, 83, 40 S. Ct. 82, 64 L. Ed. 141.

Note 2033, for $1,040, was made by T. G. Dean and indorsed by H. H. Dean. It was dated August 1, 1914, and was a renewal of a note transferred by the trust company to the bank on January 15, 1914. The loss on

this note was the entire principal. We believe that the directors are responsible for the loss on this paper. Had they examined the matter with due care, they would have discovered that it was not safe to extend the credit involved.

One other note involved in this case was taken over from the trust company on January 15, 1914, to wit, note 1991, of the White Oak Stave Company, for $5,000. It was indorsed by T. M. Dean and H. H. Dean. The loss of principal on this note, after crediting the payment by the receiver of the company, was $3,458. We think that ordinarily careful consideration by the directors on January 15, 1914, would have indicated that the corporation was not entitled to the credit which was granted. The fact that the company belonged in large part to H. H. Dean, and that he and T. M. Dean, the indorsers on the note, were also indorsers on considerable other paper then offered to the bank, as well as Dean's interest in both the financial institutions involved in the transfer of assets should have caused the directors, in the exercise of ordinary diligence, to scrutinize all of this paper most carefully. Since they failed to do so, it is not unreasonable to hold them responsible for the losses which occurred.

We may consider at this point what directors are liable for the losses on the notes taken over on January 15, 1914. The plaintiff seeks to hold only O. O. Sutton, J. D. Sutton, and the estate of I. N. Brown, because Boggs, Berry, and Mollohan settled with the receiver, H. H. Dean was not summoned, and Perkins and Bishop were exonerated by reason of their recent election to membership on the board. We think that O. O. Sutton should be held on all of the transactions mentioned, because they involve either a violation of the common-law duty of a director to use ordinary diligence, or, as in the case of note 1635 for an excessive loan, a violation of the National Banking Act. J. D. Sutton is not liable on these transactions by reason of his refusal to serve upon the board in 1914. As has already been shown, the estate of I. N. Brown is liable for those losses which resulted from a failure on his part to perform the duties of a director, as defined by the common law. He cannot be shielded from liability by want of knowledge of wrongdoing on his part, since that ignorance was the result of gross inattention in the discharge of his voluntarily assumed and sworn duty. His estate, however, is not responsible for the loss on note 1635, since it was occasioned only by failure of the directors to abide by the provisions of the National Banking Act, which expressly provides that only those who knowingly participate are liable. Corsicana National Bank v. Johnson, supra; Bowerman v. Hamner, supra.

We find that the directors generally are also responsible for the improvident loans represented by the note of T. M. Dean and the four notes of B. H. Rawson presently to be discussed. All of these notes were discounted after the transfer of January 15, 1914. It has been pointed out that during this period there was no regularly constituted discount committee, and no report of discounts to the board of directors, in accordance with the terms of the by-laws of the bank, and in fact little or no activity or supervision on the part of the directors over the affairs of the bank. Since it is clear that none of these loans would have been granted, had proper care been exercised, the directors of the bank during this period are liable therefor, with the exception of J. D. Sutton, who is exonerated for the reasons already given. The directors to be held are O. O. Sutton, the estate of I. N. Brown, Perkins, and Bishop. The two latter had been members of the board for several months before the first of the following notes was discounted; and must be held with their colleagues for the omissions of duty described.

The first of these notes is 1266, for $1,-000, due May 15, 1914, which was made by T. M. Dean and indorsed by H. H. Dean. The proceeds of the note, however, went into the deposit account of H. H. Dean, as is shown by the books and papers of the bank. The loss of principal on this note was complete. The defense to this transaction is based upon the fact that T. M. Dean owned a farm in a good state of cultivation and was himself a man of good reputation. The testimony shows that the farm was worth from $2,000 to $2,500; but when the note was discounted T. M. Dean was otherwise obligated to the bank. He was a joint indorser with H. H. Dean on the note of the White Oak Stave Company for $5,000, and was also a joint maker with H. H. Dean on a note for $4,000, which was held by the bank as aforesaid as security for note 1636 of T. G. Dean for $4,080. H. H. Dean was also an indorser at the time of the loan on other paper held by the bank, with which we are not concerned in this case. All of these matters would have been apparent to a discount committee of the board of directors upon careful investigation, and, had such investigation been made, the loan doubtless would not have been granted.

The four Rawson notes were all made subsequent to January 15, 1914. They were as follows:

Note 2059, for $2,040, dated July 24, 1914. This note was a renewal of two previous notes for $1,020, dated February 24, 1914, and April 6, 1914, respectively.

Note 2060, for $2,040, dated August 6, 1914, which is a renewal of two notes for $1,020 each.

Note 1641, for $2,500, dated June 25, 1914.

Note 1755, for $2,550, dated July 8, 1914.

Nothing has been paid on any of these notes, except the sum of $491.17 on note 1641. There is no defense to these loans, except that H. H. Dean deceived the officials of the bank; but, as a matter of fact, the discounts appear on the books of the bank and were not concealed. The failure to supervise discounts and examine the bank made it easy for Dean to secure the money for his own private enterprise, and the directors are responsible for the loss.

### Losses through Embezzlement and Fraud.

In addition to the losses from the note shortage and improvident loans, the bank suffered substantial losses from acts of· embezzlement and fraud perpetrated by H. H. Dean. In the first place, he purloined the proceeds of certain assets which should have been paid by him to the bank to the credit of a demand note of $5,002.01, given by the trust company to the bank on January 15, 1914, to balance the account between them. It was agreed by the two corporations that H. H. Dean, as treasurer of the trust company, should collect certain outstanding notes and judgments belonging to it and apply the proceeds to the payment of the note, carrying the account in the bank as treasurer of the trust company. In effect, the bank on its part agreed to intrust the custody and liquidation of this collateral to Dean as its executive officer. Dean collected about $4,500, but embezzled it. When he absconded, there were $662.87 in his account as treasurer of the trust company, which was credited upon the note, so that the loss to the bank on this item was $4,339.14.

If an indemnity bond, conditioned upon the faithful performance by Dean of his duties as vice president of the bank, had been required, it would have been liable for this embezzlement on his part. But no such bond was required. When Dean was elected cashier of the bank on January 13, 1924, the board ordered that he should give bond with some reliable surety company in the sum of $10,000. On January 15, 1914, he was elected first vice president of the bank, and it was understood that his bond as treasurer of the Farmers' Loan & Trust Company was to be transferred, so as to cover his position as vice president of the bank. But this was never done, and no excuse or explanation is offered by the defendants for this omission. Since he had access to the cash, notes, and securities of the bank, and had authority to draw upon deposits in other banks, there can be no question as to the propriety and necessity of requiring a bond from him. The testimony of experienced bank officials indicates that the bond of such an officer should have been at least $10,000. Such a bond would have been sufficient to cover the embezzlement and fraud involved in the aforegoing item of loss and those which will hereafter be discussed. Not only O. O. Sutton and the estate of I. N. Brown are liable for the losses caused by the failure to require a surety bond, but Perkins and Bishop are also liable, for no experience was needed to know that such a bond should have been exacted.

The only defense made by the directors to this specification of loss is a technical one, based upon the pleadings. The original bill of complaint as filed charged that the trust company was insolvent on January 15, 1914, that this fact could have been ascertained by the exercise of reasonable diligence by the directors, and that the acceptance of the note of the trust company for $5,002.01 was negligence on their part, for which they should be held responsible. The bill of complaint also alleged the negligent failure of the directors to require a surety bond of H. H. Dean and declared that, as a consequence thereof, the association lost large sums of money through the dishonesty, embezzlement, and fraudulent acts of Dean specified in the bill; but the bill did not specify the above embezzlement or the transactions with the Drovers' & Mechanics' National Bank and J. D. Sutton, hereinafter discussed. After the testimony was closed, to wit, on April 20, 1912, the plaintiff filed an amendment to the bill, wherein he charged specifically that the failure of the directors to require a surety bond of Dean caused the bank to lose the sum of $4,339.14, collected by him as aforesaid for application to the note of the trust company for $5,002.01, the sum of $1,000 collected by him on the J. D. Sutton note, and the sum of $2,500 on the Drovers' & Mechanics' National Bank transaction, hereinafter described. No evidence subsequent

to this amendment was taken. It was manifestly made in order that the pleadings should more closely correspond with the proof. The defendants contend, under the authority of Edgell v. Smith, 50 W. Va. 349, 40 S. E. 402, and Goldsmith v. Goldsmith, 46 W. Va. 426, 33 S. E. 266, that the amendment cannot be considered in this case, and, since the evidence does not show that the trust company was insolvent on January 15, 1914, as charged in the original bill, this item must be dismissed for failure of proof. We do not think that the cases cited justify this conclusion. In any event, since this is an equity case, we are bound by the provisions of Equity Rule 19 with regard to amendments, as interpreted by the federal courts, rather than by the decisions of the Supreme Court of West Virginia. See USCA title 28, § 724. The rule provides in substance that the court may at any time, in furtherance of justice, permit any pleading to be amended and material supplemental matter to be set forth, and that the court, in every stage of the proceeding, must disregard any error or defect which does not effect the substantial rights of the parties. We think that the amendment in this case was well within the discretion of the court and was in no sense a source of injustice to the defendants. The nature of the suit was not changed. There is no indication that the defendants were taken by surprise or deprived of an opportunity to make any defense within their power. The action of the master was in accordance with well-considered practice. Hardin, Adm'r, v. Boyd, 113 U. S. 756, 5 S. Ct. 771, 28 L. Ed. 1141; Galesburg R. R. Co. v. Hart (C. C. A.) 221 F. 7; Pennsylvania Steel Co. v. New York City R. R. (C. C.) 190 F. 602; Davis v. Gates (D. C.) 235 F. 192.

The next charge relates to an embezzlement by Dean of $1,000 collected on the note of John D. Sutton on or about February, 26, 1914. The master held that the proceeds of this note never entered the cash of the bank and that the presumption must be that Dean converted it to his own use. We have been unable to find, however, from our reading of the record, assisted by the references of counsel, any evidence which shows that this sum did not reach the bank. It must therefore be disallowed in the final decree.

The bank lost $2,500 through an allowance fraudulently made by Dean in his own interest to the Drovers' & Mechanics' National Bank of Baltimore. On October 13, 1913, B. H. Rawson gave two four-months notes to the Farmers' Loan & Trust Company for $1,000 and $1,500, respectively, indorsed by the White Oak Stave Company and John I. Bender. On October 28, 1913, the trust Company rediscounted these notes at the Drovers' & Mechanics' National Bank of Baltimore. Shortly before the maturity of the notes, the Drovers' & Mechanics' Bank sent them to the First National Bank for collection; but Dean, being interested in the White Oak Stave Company, retained the notes and made no effort to collect them. He neither made demand for payment, nor protested the notes, nor gave notice of dishonor to the indorsers. John I. Bender was then good for the amount of the notes and was able to pay them. On February 20, 1914, the Drovers' & Mechanics' National Bank, getting no reply from the First National Bank, charged these notes to its account, to which action Dean assented. Thereby the First National Bank lost $2,500, with interest. This conduct was, of course, a fraudulent breach of duty by Dean, and in effect a fraudulent conversion of $2,500 of the bank's money.

The defense to this claim is twofold: (1) That the transaction was not covered by the bill of complaint until the amendment thereof was filed. As already explained, this argument is not well founded. (2) That there is no proof in the record as to whether or not Bender was notified of the dishonor of the notes. It is conceded by the parties that protest of a note is not necessary to bind indorsers under the West Virginia law. Barnes' Code of West Virginia, c. 98a, § 36. But notice of dishonor is necessary. Cole v. George, 86 W. Va. 346, 103 S. E. 201; Thompson v. Curry, 79 W. Va. 771, 91 S. E. 801. We do not find in the record any evidence on the point, although Bender himself was called as a witness for the defendants. It is certain, however, that Bender did not pay the notes and that the bank did pay them. Dean's corporation, through his connivance, got the benefit of the proceeds of the note. Thereby the bank acquired a right of action against him, which was a direct liability and in no sense contingent upon the failure of the parties to the note to honor it. See Corsicana National Bank v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141; Adams v. Clarke (C. C. A.) 22 F.(2d) 957. Had Dean given a surety bond, the receiver of the bank would have had a right of action against the surety. The omission of the directors to require a bond makes them liable for the loss.

When the agreement of January 15, 1914, was made, the bank, as part of the con-

sideration moving to it, received from the trust company certain drafts on out of town banks, including a draft for $7,694.94 on the Central Banking & Security Company of Parkersburg, W. Va., purporting to represent a balance on deposit to the credit of the trust company. As a matter of fact, the true balance for which the Central Banking Company was liable was $5,344.27, or $2,350.67 less than the draft. This balance was established by subsequent litigation between the receiver of the First National Bank and the Central Bank, which reached this court on appeal and is reported in 249 F. 145. That opinion was followed by an additional report of the special master, and a decree of the District Court for the Southern District of West Virginia, whereby the true balance was ascertained.

It is needless to rehearse the details of the fraud perpetrated by Dean and his associates, by which they acquired, for their own use, the funds of the trust company. The facts are set out in the former opinion of this court. It suffices to say that the fraud was begun some years before the contract of January 15, 1914, and that it was effected by a charge upon the books of the trust company against the Central Bank, which had, in fact, no existence. The Central Bank, however, was held liable to the extent indicated, since it was determined by this court that it had such knowledge of the facts as to bring it within the rule that, where one of the parties must suffer from fraud of a third, even if both are innocent, the loss must fall on him whose imprudence or cooperation enabled the third party to commit the fraud. The First National Bank suffered a loss by the acceptance of the draft upon the Central Bank, because on January 15, 1914, Dean falsely represented the deposit in the Central Bank to be $2,350.67 greater than its liability as finally decreed. It does not appear, however, that this loss was increased by any action of Dean subsequent to January 15, 1914. In the latter part of that month he wrote to the Central Bank and requested that the credit of $7,694.94 carried on its books in favor of the trust company be transferred to the First National. The Central Bank agreed, upon the condition that the indorsement of the First National be substituted for the indorsement of the trust company upon the notes involved in the transaction. Dean fraudulently made the substitution. The effect, however, was merely to postpone the discovery of the crime, and did not increase the amount of money involved.

We do not think that the loss suffered by the bank in this transaction is one for which a surety bond would have been liable, unless, indeed, it had been secured prior to the transfer of January 15, 1914. We do not think that the record clearly shows that it was negligent on the part of the directors to fail to have a bond before that date, although such a bond, effective from the time when the assets of the bank were placed in Dean's control, should have been procured. Nevertheless the directors were lacking in due diligence, in that they did not verify the credits offered by the trust company. They were engaged in an important transaction which involved the transfer to their institution of the assets of a bank which was about to retire from business. Ordinary business caution required them to investigate the nature of the assets, and particularly the credits of the trust company offered in exchange for the assumption by the bank of the liabilities of the trust company. They were not justified in relying merely upon the statement of Dean, who represented the seller in the contract. It was not possible to be sure that the trust company had a credit with the Central Bank until communication with that bank was had. We think that the directors are liable on this specification, but the decree in this respect should run only against O. O. Sutton and the estate of I. N. Brown. Perkins and Bishop should be exonerated, for the same reason that they were excused from liability for the note shortage.

The final item upon which the receiver seeks to recover is an exchange of a credit of $5,000 between the bank and the S. M. Smith Insurance Agency. This transaction stands in a class by itself, because it originated on November 15, 1909, long before the transfer between the bank and the trust company, and Dean's connection with the bank as vice president. On the date mentioned, a demand note of the S. M. Smith Insurance Company for $5,000, dated September 14, 1909, was presented to the cashier of the First National Bank for discount by H. A. Harman and S. M. Smith, who were then directors of the bank. The cashier believed that the note was perfectly good, but refused to approve it, unless it was presented to the discount committee of the board. It was not so presented. Smith and Harman prepared a certificate of deposit for $5,000, indicating that the Smith Insurance Agency had that amount on deposit in the bank, payable six months after date. The cashier refused to sign the cer-

tificate, but Harman signed it in his own name for the cashier under date of December 16, 1909. The directors elected at the next annual meeting on January 13, 1910, approved the loan. The note was carried in the bank for a considerable period. In the year 1911, the Agency failed, consequent upon the failure of a trust company in which it was interested. The certificate of deposit had in the meantime gotten in the hands of innocent holders for value and was paid by the First National Bank. The master held that there was no negligence on the part of the directors involved in this accident. We agree with this finding, although it was no doubt irregular to discount the note without securing the approval of the discount committee or of the board. Nevertheless it was believed by all parties that the note was good and within 30 days of the issuance of the certificate of deposit the transaction was submitted to the board of directors and received their approval. Under these circumstances, we think that the directors are not liable for the loss incurred.

[20, 21] The defendants contend generally that the entire action against them must fail by reason of settlements which were made by the receiver with E. L. Boggs, C. E. Mollohan, and A. M. Berry. The argument is that, since the directors, if liable at all, were liable as joint tort-feasors, the release of certain defendants releases all the rest. It is a sufficient answer to this contention that the agreements between the receiver and the directors who compromised were not in the form of releases from liability, but of covenants by the receiver not to sue. By the great weight of authority, a covenant not to sue one joint tort-feasor is held not to amount to a release, and therefore does not discharge the other joint tort-feasors. Pacific States Lumber Co. v. Bargar (C. C. A.) 10 F.(2d) 335; Berry v. Pullman Co. (C. C. A.) 249 F. 816, L. R. A. 1918F, 358; Carey v. Bilby (C. C. A.) 129 F. 203; 50 A. L. R. 1081. Each director is liable in his personal and individual capacity, and may be sued alone or jointly with other directors, whether his liability is based upon a failure to perform a statutory or a common-law duty. Corsicana National Bank v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141; Bigelow v. Old Dominion Copper Co., 225 U. S. 111, 132, 32 S. Ct. 641, 56 L. Ed. 1009, Ann. Cas. 1913E, 875.

The defendants, however, are entitled to credit, against the amounts for which they are liable, the payments made by their colleagues. E. L. Boggs and A. M. Berry were directors of the bank in 1914, and had been directors during the preceding year. They were liable to suit on all of the specifications discussed, and the aggregate sums paid by them, amounting to $10,600, should be credited proportionately against the several items. C. E. Mollohan was also a director during the preceding year, and was re-elected on January 13, 1914. He was present by proxy at the stockholders' meeting on January 13, 1914, on which day he was re-elected a director. The testimony shows, however, that he did not qualify, and that his successor was elected on May 2, 1914. He paid the sum of $1,250 in settlement, which should be credited proportionately to the items of loss resulting from the negligence of the directors on January 15, 1914, except the item of $3,107.22 in note 1635. He was not liable on this item, because he had no share in making the loan. Nor was he liable on items subsequent to that date.

The defendants make the additional general defense that the receiver has not shown that it is necessary to collect the sums sued for in order to pay the debts of the bank, as alleged in the bill of complaint. It was brought out in the evidence that dividends had been paid to the creditors, aggregating from 75 to 85 per cent. of their claims in 1919, some five years after the bank was closed. It was alleged in the bill of complaint, and not denied, that the Comptroller of the Currency had found the bank to be insolvent, and that a double liability had been assessed and collected from the stockholders, other than the members of the Dean family. The defendants offered no evidence on the point, although at one time they made demand for the production of certain books then in Washington, which, it was said, would show the amount due the depositors and the amount which had been paid them. This demand, however, was not followed up.

Under these circumstances, it must be confessed that the record is not as clear as it might be on this point. On the other hand, it is by no means clear that any substantial defense exists in this respect. The case in any event must be remanded for further proceedings. An opportunity may then be afforded to the parties to take further evidence on this point, if it be desirable. In the absence of a stipulation on the part of the defendants rendering such action unnecessary, the plaintiff should offer evidence to show the amount still due the depositors, so as to determine whether the amounts due by the directors under the terms of this opinion will be necessary

to pay them. It should also be borne in mind that the directors, not only have a liability to the creditors, but may also have a liability to the stockholders. If there be any excess collected from the directors over and above the amount necessary to pay the creditors, it may be that further proceedings will lie to apply the excess to compensate such stockholders as were not implicated in the frauds upon the bank.

The question of interest remains to be considered. The special master recommended that interest be charged on the amount of the note shortage and on the sums embezzled from August 26, 1914, and that interest should be charged on the notes improperly discounted, according to the tenor thereof. The District Court decreed that interest should not begin to run until March 8, 1917, when the suit was instituted. The defendants contend that interest should not run, except from the time the amount due was judicially ascertained, on the ground that suit was brought on an unliquidated account or claim. Prior to that time, it is urged, the defendants had no means by which they could compute the amount that they owed. It was held by this court in Du Pont v. Temple, 272 F. 456, in an equity suit for the recovery of unliquidated damages, that interest was not allowable on the amount recovered prior to the decree. It was held by the Supreme Court in Miller v. Robertson, 266 U. S. 243, 257, 258, 45 S. Ct. 73, 69 L. Ed. 265, that one who has had the use of money owing to another justly may be required to pay interest from the time payment should have been made; that generally interest is not allowed upon unliquidated damages, but, when necessary, in order to arrive at fair compensation, the court, in the exercise of a sound discretion, may include interest on its equivalent as an element of damage. See, also, Jones v. U. S., 258 U. S. 40, 49, 42 S. Ct. 218, 66 L. Ed. 453; Demotte v. Whybrow (C. C. A.) 263 F. 366; Cooper v. Hill (C. C. A.) 94 F. 582; Oklahoma State Bank v. Galion Mfg. Co. (C. C. A.) 4 F.(2d) 337, 342. ▮ We think that, under the circumstances of this case, it is just to require the defendants to pay interest from the date of the institution of the suit. They had learned generally of the insolvent condition of the bank on August 26, 1914, when they directed that it should be closed. But they did not know at that time the extent of their liability, and a considerable period doubtless was consumed in ascertaining the amount of the loss which their negligence had made possible. Ample opportunity, however, was had for such investigation in the period of more than 30 months between the closing of the bank and the institution of the suit on March 8, 1917. The losses by that time were definitely fixed by the amount of the notes abstracted and improperly discounted, and by the amounts embezzled or fraudulently converted by H. H. Dean. Interest on all items should run from the date of suit, except the items covered by the amended bill of complaint, to wit, the sum of $4,339.14, representing the loss on the note of the Farmers' Loan & Trust Company, and the sum of $2,500, representing the loss on the transaction with the Drovers' & Mechanics' National Bank, on which interest should be charged from April 20, 1921, when the amended bill of complaint was filed.

Summarizing our conclusions, we find that the following losses are chargeable to one or more of the directors. Interest should be added and credits should be given as indicated above. Following each item the names of the directors liable, therefor are given:

|  | Directors Liable. | Loss. |
|---|---|---|
| Note Shortage | O. O. Sutton<br>Estate of I. N. Brown | $14,250.00 |
| Excessive Loans:<br>Note 1635 for $4591.80 | O. O. Sutton | 3,107.22 |
| 2033 for $1040.00 | O. O. Sutton<br>Estate of I. N. Brown | 1,040.00 |
| 1991 for $5000.00 | O. O. Sutton<br>Estate of I. N. Brown | 3,458.00 |
| 1255 for $1000.00 | O. O. Sutton<br>Estate of I. N. Brown<br>P. S. Perkins<br>I. C. Bishop | 1,000.00 |
| 4 notes of Rawson for $2040.00 | O. O. Sutton<br>Estate of I. N. Brown | 2,040.00 |
| 2040.00 | P. S. Perkins | 2,040.00 |
| 2500.00 | I. C. Bishop | 2,008.83 |
| 2550.00 |  | 2,550.00 |
| Embezzlement and Fraud of H. H. Dean:<br>Farmers' Loan & Trust Company note of $5,002.01 | O. O. Sutton<br>Estate of I. N. Brown<br>P. S. Perkins<br>I. C. Bishop | 4,339.14 |
| Allowance to Drovers' & Mechanics' National Bank | O. O. Sutton<br>Estate of I. N. Brown<br>P. S. Perkins<br>I. C. Bishop | 2,500.00 |
| Deficit in balance Central Banking & Security Company | O. O. Sutton<br>Estate of I. N. Brown | 2,350.67 |

The decree of the District Court must therefore be modified, and the cause will be remanded for further proceedings, in ac-

cordance with this opinion; the defendants to pay the costs in the District Court and the costs on this appeal.

Modified